A.E. STALEY MANUFACTURING CO. AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 20225–92. Filed September 11, 1995.

---

*Dan Burt, Forbes Maner, Henry B. Miller,* and *David G. Tripp,* for petitioner.
*Darrell C. Weaver* and *Michael W. Bitner,* for respondent.

CONTENTS

| | Page |
|-------------------------------------------------------------------------|------|
| FINDINGS OF FACT | 168 |
| OPINION | 180 |
| I. Introduction | 180 |
| II. Transaction | 181 |
| III. Consequences of the Acquisition for SCI and Its Shareholders ... | 182 |
| IV. *National Starch* and Its Progeny | 184 |
| A. Sections 162 and 165 | 184 |
| B. *National Starch* | 184 |
| C. *INDOPCO, Inc.* | 184 |
| D. *Victory Markets* | 186 |
| E. *Federated Dept. Stores* | 186 |
| V. Discussion | 186 |
| A. Arguments of the Parties | 186 |
| B. Duties of the Board | 187 |
| 1. Arguments of the Parties | 187 |
| 2. The Law of Delaware | 188 |
| 3. Different Constituencies | 190 |
| C. Competing Theories | 190 |
| D. Expenditures for the Benefit of Another | 191 |
| E. Capital Expenditures | 193 |
| 1. Introduction | 193 |
| 2. Nature of the Inquiry | 193 |
| 3. Origin of the Claim | 195 |
| F. Origin of the Fees | 196 |
| G. *Federated Dept. Stores* | 198 |
| H. Section 162 | 199 |
| I. Section 165 | 199 |
| VI. Conclusion | 200 |

HALPERN, *Judge:* Respondent determined a deficiency of $3,544,166 in petitioner's Federal income tax for the October 1, 1987, to May 31, 1988, tax year. After concessions, the sole issue for decision concerns the proper tax treatment of investment bankers' fees and printing costs incurred by petitioner in response to a series of unsolicited (but eventually successful) offers to acquire petitioner's stock.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

At the time the petition was filed, petitioner's principal office was located in Decatur, Illinois.

Petitioner, A.E. Staley Manufacturing Co. & Subsidiaries, was an affiliated group of corporations, formerly named Staley Continental, Inc., & Subsidiaries (SCI). The predecessor of both petitioner and SCI was A.E. Staley Manufacturing Co. (AES), which was incorporated in Delaware in 1906.

From its organization until November 1984, the primary business of AES consisted of storing and marketing corn and soybeans and of milling, processing, and refining corn and soybeans. Through a process called "corn wet milling", AES produced sweeteners, starches, oils, and other ingredients for the food and beverage industry. The principal product of AES was high fructose corn syrup, which is a sweet syrup made from corn that can be used as a substitute for cane or beet sugar in food production and industrial applications. By the mid-1980's, high fructose corn syrup became the leading sweetener in the U.S. food and beverage market, especially in the soft drink industry. However, corn wet milling was a cyclical business, because it was dependent on the supply, price, and perishable nature of a single commodity, corn.

As of 1975, Donald E. Nordlund (Nordlund) was the chief executive officer and chairman of the board of AES. In 1984, the board of directors and management of AES made a long-term strategic decision to diversify into the food service business, which they believed had significant growth potential. AES sought growth opportunities in the food service business, because AES management believed that the high fructose corn syrup market was a mature market that had little growth opportunity and thought that earnings from the food service business would provide a hedge against the cyclical corn-based business. As part of this growth strategy, in 1984,

AES acquired CFS Continental, Inc. (CFS), a leading supplier to the food service industry.

AES reorganized in 1985 to emphasize the changes in the company and its new business strategy and, also, to consolidate the management of its corn wet milling business and food service businesses; SCI was formed and became the parent company of AES and CFS. SCI moved its corporate headquarters from Decatur to Rolling Meadows, Illinois, a suburb of Chicago. The objective of SCI was to modernize the corn wet milling plants to make them more efficient so as to reduce costs and to use the revenues from corn wet milling to pursue growth in the food service business. As part of this objective, SCI acquired Smelkinson Bros. Corp., a Baltimore-Washington food service distributor; Garden Products, Inc., a Portland produce distributor; Bit O'Gold, a Chicago food service distributor; the HAVI Corp. and Fresh Start Bakeries, suppliers to the McDonald's restaurant chain; Collins Foodservice, Inc.; Churchill, Inc., a Florida coffee roasting operation; Interstate Shortening; and Full Sail Products, Inc., a Los Angeles produce distributor. In 1986, SCI disposed of its soybean processing plants, because they no longer fit within the strategic plan of the company.

## Tate & Lyle

Tate & Lyle PLC (Tate & Lyle), a publicly held United Kingdom corporation, was the largest refiner and distributor of sugar in the world. The chairman of the board of directors and chief executive officer of Tate & Lyle was Neil M. Shaw (Shaw). As of April 1988, Tate & Lyle was not involved in corn refining or the production of corn sweeteners, except for its interest in the Cereal Science & Technology Group (CST Group).

The CST Group consisted of Amylum N.V., a Belgian corporation, and Tunnel Refineries, Ltd., a United Kingdom corporation, and was involved in research and refining of starches, sweeteners, and related corn, wheat, and other small grain products. Tate & Lyle, SCI, and Compagnie Industrielle et Financiere des Produits Amylaces, S.A. (Compagnie Industrielle), a Belgian corporation, each owned 33.33 percent of the CST Group. Nordlund and Shaw were on

the board of directors of Amylum N.V. and of Tunnel Refineries, Ltd.

## Takeover Concerns of SCI

Sometime around 1986, SCI became concerned that it could become a potential target of a hostile takeover. Its concern stemmed in part from the mergers and acquisitions "climate" at that time and in part from actions allegedly taken by Drexel Burnham Lambert, Inc. (Drexel). On February 19, 1987, SCI filed a complaint in the U.S. District Court for the Northern District of Illinois against Drexel, charging Drexel with extortion and securities fraud, in violation of the Federal Racketeer Influenced and Corrupt Organizations Act and with violations of the Securities Act of 1933. In its complaint, SCI alleged that, in the fall of 1986, it planned to make a public offering of new common stock to raise capital and that Drexel deliberately accumulated SCI stock and threatened to sabotage the stock offering unless SCI abandoned its offer and agreed to a leveraged buyout of SCI that would be managed by Drexel.

SCI hired the law firm of Skadden, Arps, Slate, Meagher & Flom (Skadden Arps), which recommended that SCI adopt "antitakeover" devices. SCI adopted some antitakeover measures such as stockholder rights plans ("poison pills") and management retention agreements.

SCI also hired two investment banking firms, the First Boston Corp. (First Boston) on January 6, 1987, and Merrill Lynch Capital Markets (Merrill Lynch) on February 13, 1987. The retainer agreement with Merrill Lynch provided that Merrill Lynch was retained as a "financial advisor" to SCI "in connection with certain merger or acquisition situations." Among other services, the Merrill Lynch retainer agreement provided that Merrill Lynch would provide (1) assistance in the evaluation of advance defensive preparations of SCI and (2) advice and assistance in the event that an unsolicited offer was threatened or initiated. The First Boston retainer agreement provided that First Boston would, among other things, assist SCI in defining merger and acquisition priorities. Merrill Lynch and First Boston were each paid a retainer fee of $75,000. Additionally, both agreements provided that Merrill Lynch and First Boston would

be retained to represent SCI if an offer were made for the acquisition of the stock or assets of SCI.

In March 1987, Merrill Lynch made presentations to the management and board of directors of SCI. Although no company was attempting to acquire SCI at that time, Merrill Lynch recommended a number of actions that SCI should take to prepare itself against potential unsolicited takeover attempts. SCI implemented many of these actions, including setting up a "defensive team" of lawyers, investment bankers, and SCI executives who would be ready to respond quickly to any hostile bid; implementing a "stock watch program" to track the stock of SCI; strengthening the stock rights plan of the company; and studying the feasibility of a leveraged buy-out by management. Merrill Lynch also advised SCI that, if an unsolicited offer was made for SCI stock, the board of directors had a duty to "stop, look, and listen" and not to make any "hasty response" to that offer.

Merrill Lynch also recommended that SCI identify and seek friendly investors who could hold a blocking interest in SCI stock and act as "white knights" in the event that a raider threatened a hostile takeover of SCI. Tate & Lyle was considered a possible white knight in the event of a hostile takeover, and Nordlund and Shaw discussed the acquisition by Tate & Lyle of up to a 20-percent interest in SCI.

In April 1987, Tate & Lyle began purchasing SCI stock on the open market. In late June 1987, Robert B. Hoffman (Hoffman), the chief financial officer of SCI, contacted Tate & Lyle to determine whether Tate & Lyle would enter into a "standstill agreement" that would limit the amount of SCI stock that it would acquire. Tate & Lyle did not agree to a standstill agreement at that time.

As of June 24 and August 13, 1987, Tate & Lyle owned approximately 4.37 percent and 4 percent, respectively, of the outstanding SCI common stock. Nordlund and Shaw casually discussed the possibility of initiating discussions about a merger between Tate & Lyle and SCI; however, no substantive merger discussions occurred. In October 1987, Nordlund directed Merrill Lynch to prepare an analysis of a combination of SCI and Tate & Lyle; that study concluded that a combination would dilute the value of SCI.

On November 11, 1987, Shaw sent a handwritten note to Nordlund to inform him that Tate & Lyle might buy more

shares in SCI and that Tate & Lyle was going to file a Hart-Scott-Rodino notification. Tate & Lyle filed a Hart-Scott-Rodino notification on November 18, 1987, to acquire up to 25 percent of SCI stock. SCI management was concerned that the Tate & Lyle Hart-Scott-Rodino filing would "put SCI into play", meaning that SCI would be put up for sale.

Members of the SCI defensive team met on November 22, 1987, in preparation for a meeting with Tate & Lyle. At a meeting on November 23, 1987, SCI told Tate & Lyle that it was concerned about the Tate & Lyle Hart-Scott-Rodino filing and that SCI would oppose additional purchases of SCI stock by Tate & Lyle, unless Tate & Lyle executed a standstill agreement limiting its investment in SCI. Tate & Lyle refused to execute a standstill agreement and did not indicate whether it intended to purchase more SCI stock.

On December 14, 1987, SCI strengthened the terms of its stockholder rights plan by reducing from 40 percent to 20 percent the ownership percentage of the common stock of SCI that would trigger the "flip in" provision of the stock rights plan.

## Tender Offer by Tate & Lyle

On April 8, 1988, Tate & Lyle, through one of its U.S. subsidiaries, RP Acquisition Corp. (RP Acquisition), made a public tender offer directly to SCI shareholders through advertisements in the New York Times and the Wall Street Journal. The Tate & Lyle offer was for cash for all outstanding shares at $32 per share of common stock and was set to expire at 12 midnight on May 5, 1988. The offer was, among other things, conditioned upon (1) the nullification of the SCI shareholder rights plan; (2) the invalidity or inapplicability of the restrictions on business combinations of Del. Code Ann. tit. 8, sec. 203 (1991) (Delaware antitakeover statute); (3) the invalidity or inapplicability of the SCI benefit trust; (4) satisfaction of a super majority requirement contained in the certificate of incorporation of SCI; and (5) the shareholders of Tate & Lyle approving the offer. Tate & Lyle, however, reserved the right to waive the conditions of the offer. The closing price of SCI stock on the New York Stock Exchange on April 8, 1988, was $37.375.

Tate & Lyle did not present any proposals to acquire all of the outstanding SCI stock to the management or board of directors of SCI prior to making the tender offer. The management, board of directors, and investment bankers of SCI considered the Tate & Lyle tender offer to be hostile, because Tate & Lyle made it directly to SCI shareholders without the knowledge, endorsement, or encouragement of the management or board of directors of SCI.

Shaw wrote a letter to Nordlund dated April 8, 1988, criticizing SCI management and explaining why Tate & Lyle was making the tender offer. This letter was published in the Tate & Lyle tender offer and stated that Nordlund had "led Staley [Continental, Inc.] away from its core business * * *, using cash generated by that business to finance acquisitions and expansion in the food service distribution segment" to satisfy short-term goals and stated that Nordlund and SCI management had built a "web of entrenchment devices" to stay in office. Shaw's letter also stated that, if Tate & Lyle succeeded in acquiring control of SCI, it would immediately sell the food distribution subsidiary CFS.

Also on April 8, 1988, Tate & Lyle and RP Acquisition sued SCI in the Delaware Court of Chancery to enjoin the operation of the SCI shareholder rights plan and the use of other "antitakeover defenses"; in Federal District Court in Delaware, challenging the constitutionality of the Delaware antitakeover statute; and in South Carolina and Minnesota, seeking an injunction to avoid applicability of those States' antitakeover statutes.

In a letter to the Tate & Lyle shareholders, Shaw stated:

Tate & Lyle's strategy is to develop its sweetener businesses worldwide. Staley is a leading US producer of corn sweeteners. The acquisition of Staley will establish Tate & Lyle as a major supplier of sweeteners to the US market, and the only one offering all three products—cane sugar, beet sugar and sweeteners derived from corn. Taken with the development of sucralose, this acquisition will further enhance Tate & Lyle's position in the world sweetener industry.

Tate & Lyle has had business contacts and relationships with Staley for more than 10 years. During the last year, Tate & Lyle has built up a stake of just under five per cent of the outstanding shares of Staley Common Stock and, from time to time, there have been discussions between Tate & Lyle and Staley in which Staley has, among other things, suggested Tate & Lyle should increase its investment in Staley. As a result of its own internal review, Tate & Lyle has decided that it is not in its interests to

remain a minority shareholder, but that it should initiate the Tender Offer, and I have written to the Chairman of Staley accordingly. Despite various take-over defenses that have been implemented by Staley, the Directors of Tate & Lyle expect that the Acquisition of Staley will succeed.

At the same time as announcing the Tender Offer, Tate & Lyle is commencing litigation in the US which, among other things, challenges the take-over defenses that Staley has established, and in particular, the benefit package for Staley's senior management. In the event that any defensive litigation is initiated against Tate & Lyle, it expects to defend itself vigorously. Litigation is a commonplace feature of US tender offers.

## SCI Response to Tender Offer

The senior management and defense team of SCI held an emergency meeting on Saturday morning, April 9, 1988, to begin preparation of the response of SCI to the tender offer. The first reaction by SCI management to the tender offer was that the offer was inadequate and that a Tate & Lyle take-over would not be in the best interests of SCI, because Tate & Lyle "brought nothing to the table" in terms of capital, marketing, or research and development and, also, because Tate & Lyle would abandon the SCI long-term strategic plan of entering the food service business. No one at the April 9, 1988, meeting suggested that SCI should negotiate with Tate & Lyle, and, as of that date, SCI senior management wanted to defeat the tender offer.

However, SCI management understood that the board of directors had a duty to evaluate properly the merits of the tender offer and, on April 12, 1988, SCI hired First Boston and Merrill Lynch to advise it with respect to the Tate & Lyle tender offer. The April 12, 1988, retainer agreements provided that First Boston and Merrill Lynch would, among other things:

(1) undertake, in consultation with members of management, a study and analysis of the business, operations, financial condition and prospects of the Company [SCI];

(2) assist the Company in evaluating any proposal to acquire the Company;

(3) meet with your Board of Directors to discuss its position and any recommendation to stockholders concerning any proposal to acquire the Company as well as available strategic alternatives and their financial implications;

(4) if requested, render an opinion with respect to the adequacy of the consideration offered in any proposal to acquire the Company;

(5) to the extent requested by the Company, seek to negotiate with any person making a proposal to acquire the Company; and

(6) advise the Company in the event that the Company becomes engaged in a proxy contest.

Both the First Boston and Merrill Lynch retainer agreements provided that the fees for such services were (1) $500,000 in cash payable upon execution of the agreement; (2) if at least 50 percent of the fully diluted voting power of SCI common stock were acquired by Tate & Lyle or by any other party or group, an additional fee of 0.40 percent of the aggregate value of all such transactions; (3) if SCI effected a recapitalization, an additional fee of 0.40 percent of such recapitalization; and (4) additional quarterly fees of $500,000 for the next four quarters if no fees were paid under (2) or (3).

SCI management realized that it could not wait until the board voted on the offer before beginning to prepare the SCI "defense"; therefore, the defense team immediately began to consider alternatives to the tender offer. Due to the time constraints of the tender offer, the investment bankers began to prepare for various potential actions, including recapitalization and leveraged buyout studies and the preparation of prospectuslike documentation for prospective buyers ("white knights"), in the event the board found the offer inadequate.

On April 18, 1988, investment bankers from First Boston and Merrill Lynch made a presentation to the board showing that, on an after-tax basis, the per-share value of SCI stock ranged from $35.83 to $43.57 and, thus, that the $32 per-share tender offer was below the value that the investment bankers placed on SCI. The investment bankers also discussed options that were available to SCI, including the sale of the corporation as a whole; the sale of a division; a recapitalization; a leveraged buy-out; placement of blocks of stock; a spin-off; a public offering; and commencing an offer for Tate & Lyle ("pac-man" defense).

On April 20, 1988, after being formally advised by First Boston and Merrill Lynch that the tender offer was inadequate from a financial point of view, the SCI board voted unanimously (with one director absent) to reject the Tate & Lyle tender offer and to advise the SCI shareholders to reject it. The SCI board also resolved that it was in the best interests of the corporation and the shareholders to—

explore and investigate, with the advice and assistance of the Corporation's financial and legal advisors, the possibility, feasibility and desirability of a variety of alternative transactions, including without limitation, a financial restructuring or recapitalization of the Corporation (which might include, among other things, a substantial dividend or other distribution to shareholders of the Corporation or a self-tender offer for or other repurchase of securities of the Corporation), the sale of equity or other securities of the Corporation to a third party, the sale of the entire Corporation or one or both of its principal business segments to a third party (as part of the liquidation of the Corporation or otherwise), a joint venture between the Corporation and one or more other companies and a possible leveraged buy-out, the initiation and consummation of any of which may depend upon future developments, including future actions of Tate & Lyle and RP [Acquisition], with respect to the Tate & Lyle Offer * * *

As part of this effort, First Boston and Merrill Lynch held discussions with numerous domestic and foreign corporations and investors who they thought might be interested in acquiring all or part of SCI ("white knights" or "white squires") or in providing loans for recapitalization. First Boston and Merrill Lynch also prepared a confidential selling book called a "Descriptive Memorandum" that contained detailed information about SCI that would interest prospective buyers. These selling books were distributed to many interested parties, including Kohlberg, Kravis, Roberts & Co. SCI management also spoke directly with several companies that were identified as potential white knights. Additionally, Merrill Lynch retained counsel in the United Kingdom to investigate whether a class of Tate & Lyle preferred stock existed that SCI could purchase and use to block the Tate & Lyle tender offer.

On April 21, 1988, SCI filed a form 14D–9, Solicitation/Recommendation Statement Pursuant to Section 14(d)(4) of the Securities Exchange Act of 1934, with the Securities and Exchange Commission (SEC), recommending that SCI shareholders not tender shares and explaining that the SCI board of directors opposed the tender offer.

*Revised Offers of Tate & Lyle*

Without solicitation from SCI, on April 29, 1988, Tate & Lyle increased its all-cash offer for SCI common stock from $32 per share to $35 per share. The SCI board of directors met on May 2, 1988, and unanimously determined that the revised Tate & Lyle offer of $35 per share was inadequate,

was not in the best interests of SCI and its shareholders, and should be rejected. The board of directors also resolved that it was "desirable and in the best interests of the Corporation and its shareholders to continue to explore and investigate, with the advice and assistance of the Corporation's financial and legal advisors, the possibility, feasibility and desirability of a variety of alternative transactions". On May 3, 1988, SCI filed a form 14D–9 with the SEC and urged its shareholders to reject the revised tender offer. First Boston and Merrill Lynch continued to search for alternatives to the revised tender offer.

A May 5, 1988, Merrill Lynch interoffice memorandum pertaining to a potential recapitalization of SCI stated:

> Merrill Lynch Capital Markets ("ML") and The First Boston Corporation ("FOB") have been retained by the Board of Directors of Staley Continental, Inc. ("Staley" or the "Company") in its *defense against a proposed hostile acquisition* of Staley by Tate & Lyle PLC ("Tate & Lyle"). * * * [Emphasis added.]

On May 9, 1988, the Delaware Court of Chancery issued an opinion in the Tate & Lyle and RP Acquisition injunction action that denied a preliminary injunction enjoining the use of the SCI stockholder rights plan. The Court of Chancery stated that "a valid purpose for a stockholder rights plan (poison pill) is to promote an auction of the corporation." *Tate & Lyle PLC v. Staley Continental, Inc.*, No. 9813 (Del. Ch., May 9, 1988). Citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986), the Court of Chancery stated:

> The Board has expressed both in oral argument and to the financial press, their desire to search and find a possible "white knight" or to seek leveraged buyout financing. At this point, while the market price is greater than the tender price, the rights plan is obviously serving a useful purpose in allowing the Board to seek a more realistic offer. To do otherwise could conceivably subject the Board to actions predicated upon their failure to earnestly seek the highest bidder. * * *

Also on May 9, 1988, the U.S. District Court for the District of Delaware denied the RP Acquisition Corp. motion for preliminary injunction with respect to the Delaware antitakeover statute and rejected the Tate & Lyle (RP Acquisition) contentions concerning the unconstitutionality of the statute.

On or about May 10, 1988, First Boston and Merrill Lynch informed SCI that they were unable to find an alternative to the tender offer that would persuade shareholders not to sell their stock to Tate & Lyle. At this point, the SCI board of directors realized that it was unable to offer SCI shareholders an alternative that would create value for SCI shareholders greater than the price that Tate & Lyle was offering for the stock. SCI management directed the attorneys to engage in negotiations with Tate & Lyle, and SCI management instructed First Boston and Merrill Lynch to continue to look for alternatives to the tender offer.

On May 13, 1988, SCI, Tate & Lyle, and RP Acquisition entered into an agreement and plan of merger, pursuant to which Tate & Lyle agreed to increase the consideration offered for the shares of common stock to $36.50 per share in cash. In a board of directors meeting on May 13, 1988, the investment bankers advised the directors that the $36.50 per common share was a fair offer for SCI shareholders. The investment bankers were able to reach this determination quickly, because they had already determined the range of fair per-share values in connection with their evaluation of the Tate & Lyle offer and of the alternatives. Although the investment bankers continued to seek alternatives to the tender offer until minutes prior to the May 13, 1988, board of directors meeting, they advised the directors that none of the more than 50 potential buyers that had been contacted expressed a serious interest in acquiring SCI at a price competitive with the Tate & Lyle offer. The investment bankers also advised the directors that options such as a recapitalization or leveraged buyout were not realistic alternatives. The minutes from the May 13, 1988, board of directors meeting disclose that the board determined that the $36.50 per common share offer was "fair to and in the best interests of the holders of the Shares and hereby recommends that the shareholders of the Corporation accept the Revised Offer and vote for approval and adoption of the Merger Agreement, if necessary to effect the Merger".

In a May 16, 1988, letter to the shareholders, Nordlund stated:

Your Board of Directors has unanimously approved and adopted the Merger Agreement, determined that the second revised Tate & Lyle offer

is fair to and in the best interests of shareholders of Staley Continental, and recommends that shareholders accept the second revised Tate & Lyle offer and tender all their Staley Continental shares pursuant thereto.

In arriving at its decision, your Board of Directors gave careful consideration to a number of factors described in the attached Schedule 14D–9 that is being filed today with the Securities and Exchange Commission. Among other things, your Board considered the opinion of its financial advisors, Merrill Lynch Capital Markets and The First Boston Corporation, that the second revised Tate & Lyle offer is fair from a financial point of view to Staley Continental shareholders.

## Results of the Tate & Lyle Takeover

Tate & Lyle lent approximately $1.34 billion to its wholly owned U.S. subsidiary, Tate & Lyle, Inc. Tate & Lyle, Inc., in turn, lent RP Acquisition, which was incorporated on March 22, 1988, for the purpose of the SCI acquisition, approximately $1.34 billion. RP Acquisition also borrowed $113 million from Tate & Lyle International Finance, a wholly owned subsidiary of Tate & Lyle. RP Acquisition used the proceeds of these loans to acquire virtually all of the outstanding shares of SCI on May 31, 1988. RP Acquisition and SCI then merged, effective June 2, 1988, and Tate & Lyle held 100 percent of the stock of SCI. SCI was the surviving corporation of the merger and, as a result, succeeded to the indebtedness of RP Acquisition to Tate & Lyle, Inc., and Tate & Lyle International Finance.

Immediately after the merger, Tate & Lyle replaced the SCI senior management, including the chairman and chief executive officer, Nordlund; vice chairmen, Robert H. Cohn and Alvin W. Cohn; chief financial officer, Hoffman; executive vice president, R.E. Rocque; senior vice president for law and secretary of the board, Robert K. Scott; treasurer and vice president, Leland B. Miller; comptroller and vice president, Robert Agostinelli; controller and vice president, M.W. Urbut; and vice president for corporate relations, David Satterfield. During the 4 months after the takeover, Tate & Lyle also fired, and did not rehire, approximately 104 executives. In addition, Tate & Lyle closed the SCI Rolling Meadows headquarters, fired the clerical staff, and moved the executive offices to Decatur. Further, the entire board of directors resigned immediately after the acquisition occurred, with the exception of two directors, who resigned no later than June 8, 1988.

On June 6, 1988, Tate & Lyle announced that SCI had reached an agreement to sell CFS to SYSCO Corp. (SYSCO); the terms of the agreement were amended on August 1, 1988, and provided that SCI agreed to sell CFS to SYSCO for approximately $665 million in cash plus the assumption by SYSCO of approximately $50 million of debt. SCI used the proceeds of the CFS sale to repay a portion of the debt owed to Tate & Lyle, Inc., and to Tate & Lyle International Finance.

Effective September 30, 1988, Tate & Lyle changed the name of what remained of SCI to A.E. Staley Manufacturing Co.

*Takeover Expenses*

SCI paid $23,052,914 to law firms, investment bankers, and other vendors for services in connection with the SCI response to the Tate & Lyle tender offer, all of which it deducted on its short-year return for the period ended May 31, 1988. This amount included $6,238,109 that was paid to First Boston; $6,272,593 that was paid to Merrill Lynch; and $165,318 that was paid to Charles P. Young, a printing company that printed, bound, and mailed forms 14D–9 and other communications that were sent to SCI shareholders between April 22 and May 16, 1988.

Among other adjustments, respondent disallowed deductions for all of the fees paid to First Boston and Merrill Lynch and disallowed $50,000 of the $165,318 that was paid to Charles P. Young.

OPINION

I. *Introduction*

This case concerns the proper tax treatment of investment bankers' fees and printing costs incurred by SCI in response to a series of unsolicited offers made by Tate & Lyle to acquire the outstanding stock of SCI. Tate & Lyle's first two offers were rejected. Ultimately, however, the SCI board of directors unanimously (1) approved a plan of merger with Tate & Lyle and (2) recommended Tate & Lyle's third offer to shareholders. Tate & Lyle then acquired SCI. Petitioner claims that, since the Tate & Lyle takeover was hostile, this case is distinguishable from *National Starch & Chem. Corp. v. Commissioner*, 93 T.C. 67 (1989) (target corporation's

expenses incident to a "friendly" takeover are capital expenditures and, therefore, are not deductible under section 162(a)), affd. 918 F.2d 426 (3d Cir. 1990), affd. sub nom. *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79 (1992), and *Victory Mkts., Inc. v. Commissioner,* 99 T.C. 648 (1992) (similar). We disagree. No deduction of either the investment bankers' fees ·or the printer's fees is allowable under either section 162 or 165.

## II. *Transaction*

We will not here repeat our findings of fact,[1] but will emphasize certain salient findings concerning the period beginning April 8, 1988, the date on which Tate & Lyle tendered $32 a share to the SCI shareholders, and ending shortly after May 31, 1988, when Tate & Lyle acquired SCI for $36.50 a share.

On April 12, 1988, SCI hired First Boston and Merrill Lynch (sometimes the investment bankers) to advise it with respect to the Tate & Lyle tender offer. Both First Boston and Merrill Lynch were to be compensated by (1) a fixed fee, (2) contingent compensation if (A) Tate & Lyle or some other party acquired at least 50 percent of SCI's common stock or (B) SCI effected a recapitalization, and (3) future fixed fees if no contingent compensation were paid under (2).

On April 20, 1988, having been advised by the investment bankers that the Tate & Lyle offer of $32 was too low, the SCI board of directors (sometimes the board) voted to reject the offer and to advise shareholders to do the same. The board also resolved to explore alternatives to an acquisition by Tate & Lyle. At the direction of the board, the investment bankers contacted parties that might have been interested in acquiring all or part of SCI or in providing loans for a recapitalization. On April 29, 1988, Tate & Lyle increased its offer to $35. That offer also was rejected by the board. The investment bankers continued to search for alternatives. By about May 10, 1988, the investment bankers admitted defeat in their search for alternatives. SCI's management opened negotiations with Tate & Lyle, although the investment bankers were instructed to continue their search. On May 13,

---

[1] The trial portion of this case was conducted by Judge Mary Ann Cohen, and the facts are as found by Judge Cohen.

1988, Tate & Lyle increased its offer to $36.50. The investment bankers advised the board that that was a fair offer for SCI shareholders. The board resolved to recommend to shareholders that they accept the $36.50 offer and approve and adopt any agreement necessary to effect a merger pursuant to Tate & Lyle's plan. On May 31, 1988, RP Acquisition, an indirect subsidiary of Tate & Lyle, acquired virtually all of the outstanding shares of SCI at $36.50 a share. Following a reverse merger of RP Acquisition into SCI, SCI became a wholly owned, indirect subsidiary of Tate & Lyle.

For services rendered in connection with the Tate & Lyle tender offer (and for reimbursement of expenses), SCI paid $6,238,109 to First Boston and $6,272,593 to Merrill Lynch, all of which it deducted on its Federal income tax return.[2] SCI also paid and deducted printing costs of $165,318 ($50,000 of which is in controversy here).

As a result of the Tate & Lyle acquisition, the board resigned, senior management was replaced, many other executives were fired, offices were closed, and parts of the company were sold. SCI's name was changed back to A.E. Staley Manufacturing Co., reflecting Tate & Lyle's decision to return SCI to its original business.

### III. *Consequences of the Acquisition for SCI and Its Shareholders*

It is clear that the board did not at first welcome the approach of Tate & Lyle. SCI's senior management saw Tate & Lyle's offer of $32 a share as (1) financially inadequate to SCI's shareholders and (2) not in the best interests of SCI itself. On the latter score, management thought that Tate & Lyle "brought nothing to the table" and would abandon management's long-term strategic plan for the corporation. The board rejected Tate & Lyle's first two offers. Eventually, however, the board unanimously recommended to shareholders that they accept a revised offer of $36.50 a share as "fair" and in their "best interest". Also, the board unanimously voted to approve a plan of merger with Tate & Lyle. Manage-

---

[2] Respondent's statutory notice of deficiency also disallowed about 12 percent of the legal fee charged by Skadden, Arps, Slate, Meagher & Flom (Skadden Arps) ($649,815 out of $7,581,171). Petitioner did not contest that disallowance, and respondent, although asserting in her trial memorandum that the Skadden Arps fee should have been disallowed in its entirety, did not seek an increased deficiency.

ment's fears with regard to SCI's long-term strategic plan were realized. Immediately after the acquisition, SCI sold CFS, thereby, in effect, canceling SCI's plan to diversify into the food service business. Before the acquisition, Neil M. Shaw, chairman of the board of directors of Tate & Lyle and its chief executive officer, had announced his dissatisfaction with the direction in which SCI's management had taken SCI and his intention to return SCI to its core business. Tate & Lyle continued to operate the core business (principally sweeteners) of SCI.

Positive consequences of a nonoperational nature resulting to SCI from the acquisition include a consolidation of stock ownership and relief from shareholder-related expenses and duties.

The shareholders of SCI received $36.50 a share from Tate & Lyle. The fees paid the investment bankers pursuant to the April 12 retainer agreements necessarily benefited the shareholders of SCI by helping them obtain a price for their shares higher than the $32 a share initially offered by Tate & Lyle.[3]

---

[3] We say that for the following reasons:

RP Acquisition was funded with $1,453,000,000 for purposes of acquiring shares of Staley Continental, Inc. & Subsidiaries (SCI). Disregarding any transaction costs of RP Acquisition, 4 percent of that amount was returned to Tate & Lyle in respect of its preexisting stock interest in SCI, reducing the amount paid to other shareholders of SCI to $1,394,880,000. The offering price in the initial tender offer, rejected as inadequate with the investment bankers' advice, was $32 a share, increased to $35, again rejected as inadequate with the investment bankers' advice, and finally accepted as in the best interests of the shareholders, again with the investment bankers' advice, at $36.50 a share. That means that $4.50 a share, approximately 12 percent of the total of $36.50 a share ultimately paid for the SCI stock, represents the increase in price arguably obtained with the help of the investment bankers. Extending that computation to the full $1,394,880,000 paid for all of the non-Tate-&-Lyle-held SCI shares, there was a price increase of approximately $167 million. That compares with the approximately $12.5 million of fees paid to the investment bankers pursuant to the Apr. 12 retainer agreements. Pursuant to those agreements, some substantial part of the investment bankers' work necessarily was devoted to evaluating SCI's share value in relation to the various offers, with the remainder apparently devoted to advising and assisting the board with regard to defending against the Tate & Lyle takeover. We have no doubt that the board relied on the advice of the investment bankers in deciding, first, to reject and, ultimately, to accept an offer by Tate & Lyle. It is no more than common sense that Tate & Lyle's first increase in the amount of its offer was at least in part due to the board's rejection of its initial offer. Whether the investment bankers' search for a white knight, or other assistance in mounting a defense, accounted for Tate & Lyle's raising its offer in any amount is unknown, although it is not improbable. Certainly, at least some of the investment bankers' defensive work helped the investment bankers advise the board on May 10, 1988, that no better deal could be found.

We cannot escape the conclusion that there was a direct connection between the work of the investment bankers pursuant to the Apr. 12 retainer agreements and the $4.50 increase from Tate & Lyle's first offer of $32 to Tate & Lyle's third offer of $36.50 made on May 13, 1988. Accordingly, we conclude that, in consideration of payments of approximately $12.5 mil-

IV. *National Starch and Its Progeny*

A. *Sections 162 and 165*

Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Section 165(a) allows as a deduction "any loss sustained during the taxable year and not compensated for by insurance or otherwise".

B. *National Starch*

In *National Starch & Chem. Corp. v. Commissioner*, 93 T.C. 67 (1989) (*National Starch*), we addressed for the first time the question of whether the corporate target in a friendly acquisition is entitled to deduct the expenditures incurred by the target incident to the takeover. We concluded that the expenditures in question were capital in nature and, for that reason, nondeductible under section 162(a). *Id.* at 78. We based our holding on our judgment that the board of directors of the target (National Starch) had determined that it would be in the corporation's long-term interest to shift ownership of the corporation to Unilever, the corporate suitor. *Id.* at 75. We stated: "The expenditures in issue were incurred incident to that shift in ownership and, accordingly, lead to a benefit 'which could be expected to produce returns for many years in the future.' An expenditure which results in such a benefit is capital in nature." *Id.* (citations omitted). We found it unnecessary to reach the Commissioner's alternative argument that the expenditures were nondeductible because they were constructive distributions to the target's shareholders. *Id.* at 78–79.

C. *INDOPCO, Inc.*

Our decision in *National Starch* was affirmed by the Court of Appeals for the Third Circuit, and the judgment of the Court of Appeals was affirmed by the Supreme Court. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79 (1992) (*INDOPCO, Inc.*), affg. *National Starch & Chem. Corp. v. Commissioner*, 918 F.2d 426 (3d Cir. 1990), affg. 93 T.C. 67 (1989). In *INDOPCO, Inc.*, the Supreme Court stated:

lion made pursuant to the Apr. 12 retainer agreements, the investment bankers rendered services to SCI that substantially increased the amount realized by SCI shareholders in connection with a sale of their stock to RP Acquisition.

Although the mere presence of an incidental future benefit—*"some* future aspect"—may not warrant capitalization, a taxpayer's realization of benefits beyond the year in which the expenditure is incurred is undeniably important in determining whether the appropriate tax treatment is immediate deduction or capitalization. * * * [*Id.* at 87.]

The Supreme Court found ample support in the record for our finding that the transaction in question produced significant benefits to National Starch that extended beyond the tax year in question. *Id.* at 88. In addition to certain anticipated resource-related benefits that we had found (including the opportunity for "synergy" between National Starch and Unilever), the Supreme Court mentions National Starch's "transformation from a publicly held, freestanding corporation into a wholly owned subsidiary of Unilever", its relief from the "'substantial' shareholder-relations expenses a publicly traded corporation incurs, including reporting and disclosure obligations, proxy battles, and derivative suits", and a reordered and simplified capital structure. *Id.* at 88–89. The Court stated:

Courts long have recognized that expenses such as these, "'incurred for the purpose of changing the corporate structure for the benefit of future operations are not ordinary and necessary business expenses.'" *General Bancshares Corp. v. Commissioner,* 326 F.2d, [712] at 715 [(8th Cir. 1964)] (quoting *Farmers Union Corp. v. Commissioner,* 300 F.2d 197, 200 (CA9), cert. denied, 371 U.S. 861 (1962)). [*Id.* at 89.]

The Court appeared to view a change in ownership as a form of corporate restructuring. *Id.* The Court referred to Professors Bittker and Eustice for the "'well-established rule' that expenses incurred in reorganizing or restructuring corporate entity are not deductible under §162(a)". *Id.* (citing Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, at 5–33 to 5–36 (5th ed. 1987)). Although leaning heavily on capitalization as the rationale behind nondeductibility of corporate expenditures made incident to corporate restructuring, the Supreme Court acknowledged that such expenditures also may fail to qualify for deductibility under section 162(a) for want of being "ordinary and necessary" or incurred "in carrying on any trade or business". *Id.* at 89–90.

### D. *Victory Markets*

In *Victory Mkts., Inc. v. Commissioner,* 99 T.C. 648 (1992), the taxpayer argued that it incurred professional service fees in connection with the acquisition of its stock by an acquirer and claimed that it was entitled to deduct such expenses because, unlike the taxpayer in *INDOPCO, Inc.,* it was acquired in a hostile takeover. We declined to decide whether *INDOPCO, Inc.* required capitalization of expenses incurred incident to a hostile takeover, however, because we concluded that the nature of the takeover in *Victory Mkts.* was not hostile and that the facts were generally indistinguishable from those in *INDOPCO, Inc.*

### E. *Federated Dept. Stores*

In *United States v. Federated Dept. Stores, Inc.,* 171 Bankr. 603 (S.D. Ohio 1994), break-up fees were paid to white knights in the aftermath of failed merger attempts undertaken to avoid undesired corporate takeovers. The District Court sustained the bankruptcy court's holdings that deductions were allowable under either section 162 or section 165. The District Court relied on the bankruptcy court's findings that no benefit accrued beyond the year in which the expenditures were made and, on that basis, distinguished *INDOPCO, Inc.* The bankruptcy court judge had found explicitly that the provisions for the payment of the break-up fees did not enhance the amounts that the debtors' shareholders actually received in the takeover transactions. The District Court also agreed with the bankruptcy court that the failed merger transactions with the white knights were separate transactions from the successful takeovers, and, thus, could be treated as abandoned transactions eligible for a loss deduction under section 165.

## V. *Discussion*

### A. *Arguments of the Parties*

Petitioner recognizes similarities between its position and that of the taxpayers in *National Starch* and *Victory Mkts., Inc. v. Commissioner, supra.* Nevertheless, petitioner sees a critical distinction:

The critical factual distinction between this case and *Victory Markets, Inc. v. Commissioner,* 99 T.C. 34 (1992), and *National Starch & Chemical Corporation v. Commissioner,* 93 T.C. 67 (1989), is that SCI never wanted to be taken over by Tate & Lyle because SCI saw Tate & Lyle's takeover as a threat to its business. Tate & Lyle announced, when it launched its hostile tender offer, that it planned to discard SCI's business plan, break up the company and fire the management. The acquiring companies in *Victory Markets* and *National Starch,* on the other hand, promised to preserve the target's business plan, keep the company intact and retain the company's management. [Fn. ref. omitted.]

Respondent argues that this case is not meaningfully distinguishable from *National Starch* and *Victory Mkts.* In summary, respondent argues:

As a result of the merger between Tate & Lyle and the petitioner, benefits accrued to the petitioner which were of an indefinite or long term duration. The expenditures are thus in the nature of capital expenditures and are not deductible under I.R.C. §162(a). *INDOPCO, Inc. v. Commissioner,* 112 S. Ct. 1039, 1046 (1992).

## B. *Duties of the Board*

### 1. *Arguments of the Parties*

Both parties focus on the actions of SCI's board in the period leading up to the merger. Respondent argues:

Petitioner's board of directors had a fiduciary duty under Delaware law to act upon the Tate & Lyle tender offer in a fully informed manner and to obtain for the petitioner's stockholders the maximum value for their stock. The investment bankers' fees and the printing costs were incurred by the petitioner's board of directors pursuant to that fiduciary duty; they were not incurred to defeat the Tate & Lyle tender offer or to preserve incumbent management's business policies. [Underscored in original.]

Petitioner acknowledges the fiduciary duty of the SCI board under Delaware law. Nevertheless, petitioner has a starkly different view as to why the investment bankers were hired:

SCI hired its investment bankers in response to the threat Tate & Lyle's hostile tender offer posed to SCI's business and in an effort to protect SCI's corporate enterprise. SCI's board believed Tate & Lyle brought nothing to the table and the board knew that if Tate & Lyle's takeover was successful, Tate & Lyle would breakup [sic] the business SCI has worked so hard to build.

## 2. *The Law of Delaware*

It is basic to the law of Delaware that a corporation functions for the benefit of its shareholders under the management of its board of directors. Del. Code Ann. tit. 8, sec. 141(a) (1991). In discharging that function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders. *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del. 1939). Generally, the so-called business judgment rule protects the board from being second-guessed by the courts. The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984). The business judgment rule is applicable in the context of a takeover. *Pogostin v. Rice,* 480 A.2d 619, 627 (Del. 1984). Two cases are instrumental in understanding application of the business judgment rule to the actions of directors responding to takeover threats: *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del. 1986) *(Revlon),* and *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del. 1985) *(Unocal).*

In *Unocal,* the Delaware Supreme Court held that, before a board of directors taking or contemplating defensive action in response to a takeover bid may enjoy the protection of the business judgment rule, the board must first show (1) that it had reasonable grounds for believing that a threat to corporate policy and effectiveness existed, and (2) that the defensive measures adopted were reasonable in relation to the threat imposed. *Unocal,* 493 A.2d at 954–955. The burden of the first requirement is satisfied by a showing of good faith and reasonable investigation. *Id.* at 955. To satisfy the second requirement, the directors must analyze the nature of the takeover and its potential impact on the corporation in order to ensure balance—that the responsive action taken is responsible in relation to the threat posed. *Id.*

This entails an analysis by the directors of the nature of the takeover bid and its effect on the corporate enterprise. Examples of such concerns may include: inadequacy of the price offered, nature and timing of the offer, questions of illegality, the impact on "constituencies" other than shareholders (i.e., creditors, customers, employees, and perhaps even the community

generally), the risk of nonconsummation, and the quality of securities being offered in the exchange. * * * [*Id.* at 955.]

In *Revlon,* 506 A.2d 173, the Delaware Supreme Court addressed the extent to which a board may consider the impact of a takeover threat on constituencies other than shareholders. The court's answer was direct and simple:

while concern for various corporate constituencies is proper when addressing a takeover threat, that principle is limited by the requirement that there be *some rationally related benefit accruing to the stockholders.* * * * [*Id.* at 176; emphasis added.]

The court next addressed defensive measures (including a "poison pill", or rights, plan) adopted by the board and directed against the unwanted suitor, Pantry Pride. The court stated:

In adopting the Plan, the *board protected the shareholders from a hostile takeover at a price below the company's intrinsic value,* while retaining sufficient flexibility to address any proposal deemed to be in the stockholders' best interests.

To that extent the board acted in good faith and upon reasonable investigation. Under the circumstances it cannot be said that the Rights Plan as employed was unreasonable, considering the threat posed. *Indeed, the Plan was a factor in causing Pantry Pride to raise its bids from a low of $42 to an eventual high of $58.* At the time of its adoption the Rights Plan afforded a measure of protection consistent with the directors' fiduciary duty in facing a takeover threat perceived as detrimental to corporate interests. *Unocal,* 493 A.2d at 954–55. Far from being a "show-stopper," as the plaintiffs had contended in Moran, *the measure spurred the bidding to new heights, a proper result of its implementation. See Moran,* 500 A.2d at 1354, 1356–67. [*Id.* at 181; emphasis added.]

Once the bidding exceeded the intrinsic value of the company, the situation changed:

However, when Pantry Pride increased its offer to $50 per share, and then to $53, it became apparent to all that the break-up of the company was inevitable. The Revlon board's authorization permitting management to negotiate a merger or buyout with a third party was a recognition that the company was for sale. The duty of the board had thus changed from the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit. This significantly altered the board's responsibilities under the *Unocal* standards. It no longer faced threats to corporate policy and effectiveness, or to the stockholders' interests, from a grossly inadequate bid. The whole question of defensive measures became moot. *The directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best*

*price for the stockholders at a sale of the company.* [*Id.* at 182; emphasis added.]

### 3. *Different Constituencies*

There is no disagreement between the parties as to Delaware law, nor is there serious disagreement between them with regard to the propriety of the SCI board's actions in response to the Tate & Lyle offers. In the end, the board recommended a Tate & Lyle offer of $36.50 to SCI's shareholders. Nevertheless, petitioner characterizes Tate & Lyle's takeover as hostile. By hostile, petitioner means that Tate & Lyle undertook its takeover without the approval or cooperation of SCI's management or board of directors. Indeed, the SCI board rejected the first two offers made by Tate & Lyle. With regard to the second offer, the board determined not only that the offer was inadequate from a financial point of view but also that it was not in the best interests of SCI and its shareholders. Apparently, the board took into consideration the interests of corporate constituencies other than shareholders. There was reason for the board to be concerned on account of those constituencies: Neil M. Shaw, chairman of the board of Tate & Lyle and its chief executive officer, had announced his dissatisfaction with SCI's management and his intention to return SCI to its core business. Nevertheless, when Tate & Lyle's offer was raised to $36.50, the board unanimously (1) approved a plan of merger with Tate & Lyle and (2) recommended that offer to shareholders. At that price, the board had to subordinate its concern for corporate constituencies other than shareholders to the interests of shareholders. That is because, as made plain in *Unocal* and *Revlon,* although, in defending against a corporate takeover, the board may consider the interests of constituencies other than the shareholders of the corporation, the board may not act to satisfy those other constituencies unless, in doing so, the shareholders also will benefit.

It is within that context of State law rules that we must decide whether, for Federal income tax purposes, the investment bankers' fees and printing expenses are deductible.

### C. *Competing Theories*

The primary context for our analysis is section 162(a), which, as we have stated, allows the deduction of "all the

ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." In the face of Tate & Lyle's takeover offer, the SCI board had a duty to SCI's shareholders, which, in part, it discharged by incurring the investment bankers' fees, so that it could evaluate and, as it turned out, recommend a Tate & Lyle offer to SCI's shareholders. The resulting financial benefit to SCI's shareholders suggests that SCI incurred the fees (and printing expenses) in question not in carrying on the business of the corporation but, rather, directly and immediately to benefit its shareholders. That of course, would be sufficient cause to disallow a deduction under section 162(a). If, however, we conclude that the expenditures in question were incurred in carrying on the trade or business of SCI, we still must determine whether the expenditures are immediately deductible or, as in *National Starch,* must be capitalized.

### D. *Expenditures for the Benefit of Another*

For an expenditure to be deductible under section 162(a), it must, among other things, be directly connected with or pertain to the trade or business of the taxpayer. Sec. 1.162–1(a), Income Tax Regs. Thus, fees paid by a corporation in connection with the sale of stock by its shareholders are not deductible by the corporation. *Snyder Bros. Co. v. Commissioner,* T.C. Memo. 1980–275 (legal fees paid by corporation in regard to the sale of shares by a shareholder represented expenses paid for the benefit of another and were not deductible); *George Haiss Manufacturing Co. v. Commissioner,* T.C. Memo. 1957–241 (similar; payments to attorney/accountant who also acted as broker); *Southern Engg. & Metal Prods. Co. v. Commissioner,* a Memorandum Opinion of this Court dated Feb. 9, 1950 (similar; attorney's and accountant's fees).

In *Sammons v. Commissioner,* T.C. Memo. 1971–145, affd. 472 F.2d 449 (5th Cir. 1972), we found that the primary objective of a corporate transaction was for the benefit of a taxpayer-shareholder rather than for any valid business purpose. In affirming our decision, the Court of Appeals agreed that primary purpose was the correct test:

It is true that "(t)he line between shareholder benefit and corporate benefit is not always clear * * *" But this does not mean that where the primary or dominant motivation for a distribution was to benefit the stock-

holder rather than the corporation that the articulation of a concededly subordinate business justification should cause the entire transaction to be recharacterized for tax purposes. To permit such a swallowing up of the greater by the lesser would require us to espouse a rule of law which both ignores the substance of corporate transactions and sharply departs from the recent trend of cases * * *. We decline to so rule. * * * [*Sammons v. Commissioner,* 472 F.2d 449, 452 (5th Cir. 1972).]

Nevertheless, a corporate expenditure that benefits *all* of the shareholders of the corporation may be distinguished from one that benefits just a select few. For instance, corporate expenditures made incident to a proxy fight are deductible if incurred primarily in connection with matters of corporate policy. In *Locke Manufacturing Cos. v. United States,* 237 F. Supp. 80 (D. Conn. 1964), the taxpayer incurred fees for legal counsel, a public relations consultant, and a proxy solicitor when a dissident shareholder challenged the directors' plans to expand the business and attempted to unseat the entire board. Respondent disallowed a portion of the fees paid to the public relations consultant and the entire fee paid to the proxy solicitor, asserting that those fees did not qualify as ordinary and necessary business expenses. Since the corporation had established that the expenses were incurred in a dispute over basic corporate policy, and not over personalities, and that the fees were reasonable in amount and were incurred for the benefit of all the shareholders in the good faith belief on the part of management that it was in the best interests of all of the shareholders successfully to resist the dissident, the court held that the payment of the fees was proper. The court then allowed a deduction under section 162(a), pointing out that an expense may be ordinary and necessary under the standard set in *Welch v. Helvering,* 290 U.S. 111 (1933), even though it is unusual in the life of the particular taxpayer. Respondent has agreed to follow *Locke.* Rev. Rul. 67–1, 1967–1 C.B. 28 (expenditures incident to a corporate proxy fight deductible under section 162(a) if made primarily in connection with questions of corporate policy rather than for benefit of particular officers or shareholders).

In the statutory notice of deficiency upon which this case is based, respondent explained her disallowance of petitioner's deductions of the investment bankers' fees and printing costs in question as follows: "It has *not* been established that

any of those amounts * * * are deductible as ordinary and necessary business expenses for income tax purposes." Respondent could have pursued that claim by arguing that the expenditures in question were made primarily for the benefit of shareholders and, thus, were not incurred in the business of SCI. Indeed, in *National Starch,* 93 T.C. at 78–79, where we found that the expenditures were capital in nature, we stated: "We need not reach respondent's alternative argument that petitioner's expenditures were constructive distributions to its shareholders." Here, on brief, in pursuit of her claim that the expenditures are nondeductible under section 162(a), respondent has argued only that they are capital in nature. She has not argued for a constructive distribution. Thus, we assume that, here, the timing, rather than the fact, of deductibility is principally of concern to respondent. We will proceed on that basis.

E. *Capital Expenditures*

1. *Introduction*

The inquiry as to whether an expenditure may be deducted under section 162(a) or must be capitalized is an inquiry into the proper time to give tax effect to the expenditure. As the Supreme Court put it in *INDOPCO, Inc.,* 503 U.S. at 83–84:

The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: While business expenses are currently deductible, a capital expenditure usually is amortized and depreciated over the life of the relevant asset, or, where no specific asset or useful life can be ascertained, is deducted upon dissolution of the enterprise. See 26 U.S.C. §§167(a) and 336(a); Treas. Reg. §1.167(a), 26 CFR §1.167(a) (1991). Through provisions such as these, the Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes. * * *

2. *Nature of the Inquiry*

The inquiry as to whether an expenditure may be deducted or must be capitalized is fact specific. The general nature of that inquiry is concisely described in 6 Mertens, Law of Federal Income Taxation, sec. 25.37, at 118 (Mar. 1992 rev.):

Assuming that the expenditure is ordinary and necessary in the operation of the taxpayer's business, the answer to the question of whether the

expenditure is a deduction allowable as a business expense must be determined from the nature of the expenditure itself which in turn depends on the extent and permanence of the work accomplished by the expenditure. * * * [Fn. ref. omitted.]

See also *E.I. du Pont de Nemours & Co. v. United States,* 432 F.2d 1052, 1059 (3d Cir. 1970) (quoting Mertens text); *Falstaff Beer, Inc. v. Commissioner,* 322 F.2d 744, 748 (5th Cir. 1963) (quoting Mertens text at 746); *Woolrich Woolen Mills v. United States,* 289 F.2d 444, 449 (3d Cir. 1961); *York Water Co. v. Commissioner,* 36 T.C. 1111, 1116 (1961); *Donohue v. Commissioner,* T.C. Memo. 1966–149.

To determine whether the expenditures in question are presently deductible, petitioner asks us to consider the motivation of SCI in hiring the investment bankers: "SCI hired its investment bankers in response to the threat Tate & Lyle's hostile tender offer posed to SCI's business and in an effort to protect SCI's corporate enterprise." In *National Starch,* 93 T.C. at 78, the taxpayer argued that the expenses in question should have been deductible because they were required by, and carried out, the directors' fiduciary duty to the shareholders. We responded:

The dominant aspect of the transaction was not the fiduciary duty. Instead, the dominant aspect was the transfer of petitioner's stock for the benefit of petitioner and its shareholders. We would let the tail wag the dog if we were to view the stock transfer as the incidental aspect and the fiduciary duty that arose from the stock transfer as the dominant aspect. [*Id.*]

If the purpose of the relevant Code provisions is to match expense with income, the directors' subjective reasons for making the expenditure are not significant to the analysis. Thus, presumably, under the "well established rule" recognized by the Supreme Court in *INDOPCO, Inc.,* 503 U.S. at 89, that expenditures incurred in reorganizing or restructuring the corporation are not deductible under section 162(a), no deduction is available for corporate expenditures made incident to a recapitalization or other reorganization even if the transaction is undertaken to protect the corporation against the threat of being acquired. See also *Woolrich Woolen Mills v. United States,* 289 F.2d 444 (3d Cir. 1961) (cost of wastewater filtration plant with life of more than 1 year had to be capitalized notwithstanding that expenditure

was involuntary (made under threat of injunction), would not have been made as a matter of wise and prudent management, and plant was not a productive part of taxpayer's manufacturing process). In *National Starch,* 93 T.C. at 75, we found that the expenditures in issue were incurred incident to a shift in ownership of the corporate stock to Unilever. We explained: "The expenditures in issue were incurred incident to that shift in ownership and, accordingly, lead to a benefit 'which could be expected to produce returns for many years in the future.'" *Id.* (quoting *E.I. du Pont de Nemours & Co. v. United States, supra* at 1059).

### 3. *Origin of the Claim*

In the companion cases of *Woodward v. Commissioner,* 397 U.S. 572 (1970), and *United States v. Hilton Hotels Corp.,* 397 U.S. 580 (1970), the Supreme Court held that fees incurred to value stock held by dissident minority shareholders were capital expenditures, rather than expenses deductible under section 162(a) or 212. In so holding, the Supreme Court rejected a subjective "primary purpose" test in favor of the objective "origin of the claim" test set forth in *United States v. Gilmore,* 372 U.S. 39 (1963). Under the origin of the claim test, the nature of the transaction out of which the expenditure in controversy arose governs whether the item is a deductible expense or a capital expenditure, regardless of the motives of the payor making the payment. *Woodward v. Commissioner, supra* at 578. We have said that, in drawing the line between currently deductible and capital expenditures, with respect to litigation expenses, in cases involving the acquisition, retention, or disposition of capital assets, and in cases involving the defense or perfection of title to property, the origin and character of the claim, not the purpose for which the claim is prosecuted, are the controlling criteria. *Estate of Davis v. Commissioner,* 79 T.C. 503, 508 (1982). We have applied the origin of the claim test to legal fees unconnected with litigation. In *Weisman v. Commissioner,* 97 T.C. 563 (1991), the legal fees were incurred in connection with a redemption of stock that was prompted by an outside threat to the survival of the corporation. We also have applied a variant of the origin of the claim test to fees paid for investment advice and counsel to determine whether such fees were capital in nature. *Honodel v. Commissioner,* 76

T.C. 351 (1981), affd. 722 F.2d 1462 (9th Cir. 1984). In *Honodel,* we focused on the "'nature of the services performed'" rather than on "'their designation or treatment'" by the taxpayer. *Id.* at 365 ("We adopt an inquiry consistent with that of the Supreme Court [in *United States v. Gilmore,* 372 U.S. 39 (1963), and *Woodward v. Commissioner,* 397 U.S. 572 (1970)] by looking at the nature of the services performed (the origin of the fee) in determining whether such services are rendered in the process of acquisition." *Id.* n.5). We must make a similar inquiry here, to determine, objectively, whether the services obtained by SCI from the investment bankers and the printer gave rise to a continuing benefit to SCI.

### F. *Origin of the Fees*

In *INDOPCO, Inc.,* 503 U.S. at 89, the Supreme Court cited favorably *General Bancshares Corp. v. Commissioner,* 326 F.2d 712 (8th Cir. 1964), affg. 39 T.C. 423 (1962), for the proposition that corporate expenditures made in connection with changes in corporate structure are capital in nature. The Supreme Court appeared to view a change in ownership as a form of corporate restructuring. *INDOPCO, Inc.,* 503 U.S. at 89. In *General Bancshares,* Justice Blackmun (who later authored *INDOPCO, Inc.*), who was then a Court of Appeals judge, explained the rationale behind cases denying deductions for costs "which have to do basically with corporation structure":

> The rationale behind these decisions appears to us to be that the purpose for which the expenditure is made has to do with the corporation's operations and betterment, sometimes with a continuing capital asset, for the duration of its existence or for the indefinite future or for a time somewhat longer than the current taxable year, in contrast to being devoted to the income production or other needs of the more immediate present. * * * [*General Bancshares Corp. v. Commissioner, supra* at 715.]

See also *INDOPCO, Inc.,* 503 U.S. at 90 (partially quoting that explanation).

Tate & Lyle's acquisition of SCI clearly was expected by SCI's board to affect SCI's operations and betterment for the indefinite future. Neil M. Shaw, the chairman of the board of directors and chief executive officer of Tate & Lyle, had openly criticized SCI for moving away from its core business

and had announced his plan immediately to sell the food distribution subsidiary of SCI. Moreover, this is not the case of Tate & Lyle having *no* long-term plans for SCI, acquiring it only to liquidate it immediately and completely. Tate & Lyle *did* have long-term plans for SCI: to return SCI to its core business and, thereby, to establish Tate & Lyle (with SCI as a component) as a major supplier of sweeteners in the U.S. market and to further enhance Tate & Lyle's position in the world market for sweeteners. It is plain that the members of SCI's board and the senior management of the corporation had personal reasons to fear an acquisition by Tate & Lyle. Nevertheless, whatever reservations members of the board may have had concerning Tate & Lyle's immediate or long-term plans for SCI, the inescapable fact is that the board (1) approved a merger with Tate & Lyle and (2) recommended Tate & Lyle's third offer to shareholders as "fair" and in their "best interests".

The expenditures in question—investment bankers' fees and printing costs—were made in connection with the change in ownership. The investment bankers' fees, in particular, were expended to receive an evaluation of Tate & Lyle's offers, to find alternatives thereto (which alternatives included financial restructuring and recapitalization, or a sale of the corporation), and for other advice. Indeed, all but approximately $1 million of the $12.5 million in fees and expenses paid to the investment bankers was based on the fact that Tate & Lyle acquired more than 50 percent of SCI's common stock. No doubt based in part on the investment bankers' evaluation and advice, the SCI board ultimately accepted the third Tate & Lyle offer, which admittedly had extended consequences for the operations of SCI. SCI also obtained certain shareholder-related benefits that the Supreme Court, in *INDOPCO, Inc.,* found significant in denying an immediate deduction: transformation from a publicly held corporation to a wholly owned subsidiary and relief from substantial shareholder-related expenses. The printing fees in question facilitated communication with shareholders and others in connection with the acquisition. Neither the investment bankers' fees nor the printing fees related to current income production or needs of the immediate present. Those fees were incurred in connection with a change in ownership with indefinite and extended future consequences to SCI.

They are properly matched against revenues of a taxable period (perhaps an indefinite taxable period) longer than the taxable year during which such fees were incurred. See *INDOPCO, Inc.* 503 U.S. at 83–84.

What of the fact that petitioner characterizes the Tate & Lyle takeover as hostile? Clearly, the acquisition meant a strategic change for SCI, and, just as clearly, it would affect negatively certain corporate constituencies important to the board. Nevertheless, in the end, the board agreed to an acquisition by Tate & Lyle. Whatever duty the board owed to corporate constituencies other than the shareholders of SCI was discharged when the board agreed to the acquisition. In *National Starch,* 93 T.C. at 76, we said: "Because * * * [National Starch's] directors approved the takeover, they must have determined that it was in the best interest of * * * [National Starch] and its shareholders." We said virtually the same thing in *Victory Mkts., Inc. v. Commissioner,* 99 T.C. at 665. The SCI board had a singular duty to the corporation and its shareholders, which it discharged by approving the acquisition. This case is, on the surface, different than *National Starch* and *Victory Mkts.* in that the board's approval was not accompanied by equally laudatory press releases and after-the-fact annual report language announcing the benefits of the acquisition. SCI's new owner would be hard pressed, however, to deny that it did not see benefits in the acquisition or the opportunity for synergy. We have here the board's approval. We also have certain shareholder-related benefits that the Supreme Court, in *INDOPCO, Inc.,* found significant in denying an immediate deduction (transformation from a publicly held corporation to a wholly owned subsidiary and relief from substantial shareholder-related expenses). Any distinctions between this case, on the one hand, and *National Starch* and *Victory Mkts.* on the other, are distinctions without a difference. Petitioner has failed to persuade us that the acquisition of its stock by Tate & Lyle did not produce significant benefits to SCI that extended beyond the tax year in question.

G. *Federated Dept. Stores*

In *United States v. Federated Dept. Stores, Inc.,* 171 Bankr. 603 (S.D. Ohio 1994), the District Court sustained the bankruptcy court's holdings that break-up fees paid to "white

knights" in failed attempts to thwart undesired takeovers gave rise to deductions allowable under either section 162 or section 165. This case is distinguishable from *Federated Dept. Stores* in that there are no failed "white knight" transactions that possibly could be treated as abandoned transactions eligible for a loss deduction under section 165. See *supra* sec. V.F. With regard to section 162(a), the District Court did not rely on the fact that the takeovers were hostile but rather on the fact the targets did not obtain any significant future benefits when they were acquired in highly leveraged acquisitions by an acquirer that "was inexperienced in the [targets' business] field." *United States v. Federated Dept. Stores, Inc., supra* at 30–31. The court's conclusion apparently was colored by the fact that, shortly after the takeover, the targets ended up in bankruptcy. The evidence here informs us that Tate & Lyle acquired SCI with the intention of continuing its operations, albeit in contracted form. Tate & Lyle paid what the board of SCI obviously thought was a good price for SCI shares. We assume that Tate & Lyle thought that it could operate SCI profitably at the price it paid. We have no evidence that it is not doing so. We are unqualified to exercise any judgment as to the business wisdom of the acquisition. This case is unlike *Federated Dept. Stores;* it is distinguishable.

## H. *Section 162*

For the reasons stated, no deduction is allowed under section 162(a) on account of either the investment bankers' fees or the printing expenses in question.

## I. *Section 165*

Petitioner argues that (1) all of the investment bankers' efforts were directed toward defeating Tate & Lyle's offer, (2) the investment bankers investigated plans that, if successful, would have required capitalization of their fees, (3) all of the investment bankers' work was abandoned when the board decided to accept a Tate & Lyle offer, and (4) thus, SCI is entitled to deduct its expenditures with regard to its abandoned plans as a loss pursuant to section 165. In support of a deduction under section 165, petitioner states:

The courts and the I.R.S. recognize that where a plan of reorganization or a public offering is abandoned, the expenditures related to the proposed plan are deductible in the year the plan is abandoned. *See Sibley, Lindsay and Curr Co. v Commissioner,* 15 T.C. 106 (1950), *acq.* 1951–1 C.B. 3; *El Paso Company v. United States,* 694 F.2d 703, 712 (Fed. Cir. 1982); Rev. Rul. 73–580, 1973–2 C.B. 86; Rev. Rul. 79–2, 1979–1 C.B. 98. A deduction for the expenditures related to an abandoned project is allowed in the year of abandonment because at that point it is clear the expenditures will not produce any future benefit. *See* Rev. Rul. 74–104, 1974–1 C.B. 70.

No doubt petitioner is correct in its statement of the law. E.g., in *Sibley, Lindsay & Curr Co. v. Commissioner,* 15 T.C. 106 (1950), Goldman, Sachs and Co., investment bankers, presented three proposals to the taxpayer for the revision of its capital structure. The taxpayer adopted one of the proposals but deducted all of the fee paid to the investment bankers. The taxpayer conceded that one-third of the expenditure was a nondeductible capital expenditure. We allowed a deduction for the remaining two-thirds, finding that the three proposals were "separate and distinct suggestions" not alternatives, and that the taxpayer could have accepted "*all or any*" of them but adopted only one, abandoning the other two. Petitioner has not proven any allocation of the fees paid First Boston and Merrill Lynch, or the printing fees, to any separate and distinct proposals that were abandoned. The bulk of the fees paid the investment bankers was pegged to a completed stock sale, not an abandoned recapitalization or other abandoned transaction. Of the approximately $12.5 million in fees paid, $1 million was fixed compensation, payable in any event. Substantially all of the remainder was contingent compensation, payable because Tate & Lyle acquired at least 50 percent of SCI's common stock. No deduction is allowable under section 165.

## VI. *Conclusion*

In *INDOPCO, Inc.,* the Supreme Court concluded that, if expenditures incident to a takeover fail to satisfy the requirements of section 162(a), they are not deductible under that section. Here the investment bankers' fees and the disallowed portion of the printing costs were incurred in connection with a change in the ownership of SCI. That change portended strategic changes for SCI with long-term consequences. The expenditures are capital in nature, and that

is a sufficient reason to deny SCI a deduction under section 162(a). Also, they are not deductible under section 165.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

HAMBLEN, SWIFT, GERBER, WRIGHT, PARR, WELLS, RUWE, WHALEN, COLVIN, and BEGHE, *JJ.*, agree with this majority opinion.

FOLEY, *J.*, concurs in the result only.

———————————

BEGHE, *J.*, concurring: I join the majority opinion in this case because I agree with its interpretation and application—even if it arguably amounts to an extension—of the Supreme Court's reasoning in *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79 (1992). Given the way that the line of battle was drawn and disputed by the parties, I've joined the majority in indulging the inference that long-term benefits to SCI resulted from the services of the investment bankers, justifying the disallowance as deductions through capitalization of their fees, particularly those fees that were generated by the done deal. However, I write separately to respond to some of the dissenters' specific points as well as to highlight the prior question—one that we saw fit to avoid in *National Starch & Chem. Corp. v. Commissioner*, 93 T.C. 67, 78–79 (1989), affd. 918 F.2d 426 (3d Cir. 1990), affd. sub nom. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79 (1992), but which the majority opinion adverts to—whose correct answer would also lead to disallowance of some substantial part if not all of the claimed deductions.[1]

As a preliminary matter, I disagree with Judge Cohen's conclusion that the majority has adopted a "more stringent rule" than the rule applied in *INDOPCO, Inc.* or *Victory Mkts., Inc. v. Commissioner*, 99 T.C. 648 (1992). Cohen, *J.*,

———————————

[1] The most important ancillary tax consequence of adopting the alternative theory of disallowance suggested in this concurring opinion is that the disallowed amount would not appear on the tax balance sheet as capital expenditures that might be deductible at some later time, such as the payor's liquidation. *Hollywood Baseball Association v. Commissioner*, 42 T.C. 234, 255–256, 270–271 (1964), affd. on another issue 352 F.2d 350 (9th Cir. 1965); *Shellabarger Grain Prods. Co. v. Commissioner*, 2 T.C. 75, 89 (1943), affd. 146 F.2d 177, 185 (7th Cir. 1944). See generally Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 5.06 (6th ed. 1994). However, the payor's shareholders may not necessarily be taxable on the value of the benefit or the amount of the payment. See *infra* note 8 and text.

dissenting op. p. 210. I don't read the majority opinion as laying down a per se rule that "any expenses relating to a change in corporate ownership are not deductible." *Id.*

The keys to the majority's opinion requiring capitalization are its findings that neither the investment bankers' fees nor the printing costs related to current income production or needs: "Those fees were incurred in connection with a change in ownership with indefinite and extended future consequences to SCI. They are properly matched against revenues of a taxable period (perhaps an indefinite taxable period) longer than the taxable year during which such fees were incurred." Majority op. pp. 197–198. Although it would be a rare change in corporate ownership that does not have indefinite and extended future consequences, the majority's inquiry is consistent with the Supreme Court's observation in *INDOPCO, Inc. v. Commissioner, supra* at 89 (internal quotation marks omitted), that "Courts long have recognized that expenses * * * incurred for the purpose of changing the corporate structure for the benefit of future operations are not ordinary and necessary business expenses." The emphasis should not be on the word "benefit" if that is to suggest that we must determine whether the corporation will be advantaged by the change. The contrast is between expenditures that have current effects as opposed to definite or indefinite future consequences. That, of course, is the contrast that the majority points out was emphasized by the Court of Appeals for the Eighth Circuit in *General Bancshares Corp. v. Commissioner,* 326 F.2d 712, 715 (8th Cir. 1964), affg. 39 T.C. 423 (1962), the case that the Supreme Court cited with approval in *INDOPCO, Inc.* in support of its comment about "benefit". Majority op. p. 196.

Even if I agreed with the dissenters' conclusion that the investment bankers' fees produced no long-term benefit to SCI, the facts of this case[2] as well as the inherent facts of corporate life in corporate takeover bids[3] would require the conclusion that some part of the advice of the investment bankers produced a benefit to the shareholders of SCI by

---

[2] See majority op. note 3 and pp. 182–183; pp. 191–193.

[3] See, e.g., Johnson, "The Expenditures Incurred by the Target Corporation in an Acquisitive Reorganization Are Dividends to the Shareholders (Psst, Don't Tell the Supreme Court)", 53 Tax Notes 463 (1991); Sheppard, "The *Indopco* Case and Hostile Defense Expenses", 54 Tax Notes 1458, 1460 (1992); Faber, *"Indopco:* The Still Unresolved Riddle", 47 Tax Law. 607, 640 (1994).

helping them obtain a higher price for their shares than Tate & Lyle's initial offering price. As a result, this case could have been decided by dealing with the prior issue encompassed by the language of the statutory notice, "It has *not* been established that any of those amounts * * * are deductible as ordinary and necessary business expenses for tax purposes", and adverted to by the Supreme Court in *INDOPCO, Inc. v. Commissioner, supra* at 90. This concerns the corporate payor's need to establish deductibility of the expenditures under section 162(a) as "ordinary and necessary" and "incurred in carrying on any trade or business".

The parties did not try or argue this case on the theory of shareholder benefit, although that theory was put in play by the statutory notice. In appropriate future cases, that theory might justify an allocation between nondeductible fees for services that benefit the shareholders of the target by helping them obtain a higher price for their shares and some portion allocable to services in aid of an unsuccessful defense that arguably turn out to be of no benefit to anyone other than the service providers who received the fees.

Judge Cohen argues that the majority's conclusion—and I agree with that conclusion—that the investment bankers' services for which the fees were paid necessarily benefited the SCI shareholders by helping them obtain a higher price for their shares confuses the simple sequence of events with a cause and effect relationship. Cohen, *J.,* dissenting op. p. 217. I believe that the cause and effect relationship is clear. On April 7, 1995, the day before Tate & Lyle's initial bid, SCI shares closed at $31.50,[4] 50 cents less than Tate & Lyle's initial bid of $32 on April 8, on which, no doubt due to the buying activity of arbitrageurs, SCI shares closed at $37.375. On April 20, 1995, the SCI board rejected Tate & Lyle's initial bid of $32 and so advised the SCI shareholders. This is because, in the meantime, after the April 12 retainer agreements were in place, the investment bankers had advised the SCI board that the per-share value of SCI was in the range of $35.83 to $43.57, and that the $32 initial offer was clearly inadequate. In response to the rejection of its initial offer, Tate & Lyle raised its offer two more times. Once the Tate

---

[4] See appendix, *infra* p. 209–210, setting forth closing prices of SCI shares for the period Mar. 1 to June 7, 1988, as stipulated by the parties.

& Lyle offer had been raised to $36.50, an amount within the range of fair market values previously determined by the investment bankers, they advised the SCI directors that there was no way out other than to accept the last offer.

The causal relationship is clear. The advice of the investment bankers justified the SCI board's rejection of the initial Tate & Lyle offer and made it necessary for Tate & Lyle to raise its offer to an amount that was within the range of values determined by the investment bankers. The investment bankers' advice benefited the SCI shareholders by helping them obtain a higher price for their shares.

The question of shareholder benefit was also kept in play by the parties' disagreement—expressed in their briefs and addressed by the dissent—over when the directors' fiduciary duty under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del. 1986), matured into a duty to obtain the best price for the shareholders. The SCI board's initial fiduciary duty to resist the takeover attempt does not require that the investment bankers' fees be given or retain the character of ordinary and necessary trade or business expenses over the entire course of the takeover attempt. Characterization of the expenses should be postponed until the takeover attempt and defense are completed, and the effects of the expenditures can be determined.

The investment bankers earned their fees by providing advice that served interrelated functions that permitted the SCI directors to satisfy their fiduciary duties to the corporation and its shareholders. See *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 955 (Del. 1985) ("they satisfy that burden 'by showing good faith and reasonable investigation'" (quoting *Cheff v. Mathes,* 199 A.2d 545, 554–555 (Del. 1964))). If the SCI directors had immediately approved the initial offer and supported Tate & Lyle, or had found a "white knight" whose offer was accepted by the SCI shareholders, the bulk of the investment bankers' fees would clearly have been properly capitalizable as expenditures providing long-term benefits. *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79 (1992); *Victory Mkts., Inc. v. Commissioner,* 99 T.C. 648 (1992). If petitioner had redeemed or issued stock in successfully defending against Tate & Lyle's offers, the expenditures would have been capitalized as costs of acquiring or issuing stock. Sec. 162(k); *Woodward v.*

*Commissioner,* 397 U.S. 572, 576 (1970); *United Carbon Co. v. Commissioner,* 32 B.T.A. 1000, 1010 (1935), revd. 90 F.2d 43 (4th Cir. 1937). However, in the case at hand, even if petitioner had not received any long-term benefits from the takeover, and did not redeem or issue any stock, it did incur costs that helped to provide its shareholders with an addition of $167 million to the price received for their shares (although at the time the expenditures were authorized the amount and existence of the benefit were unclear) at the total cost of $23 million, including the amounts in issue paid to the investment bankers.

As disclosed by the majority's recital of the facts and the observations of the commentators cited above,[5] the shareholder benefit theory is an appropriate rationale for disallowing the target's expenditures incurred in defending itself against an initially hostile takeover attempt. The opinion of the Delaware Supreme Court in *Revlon,* as well as the actual facts in the case at hand, makes clear that the unsuccessful defensive measures contribute to the increased price ultimately obtained by the target shareholders. Even if the initial hostility between SCI and Tate & Lyle reflects a difference from the friendly takeovers in *INDOPCO, Inc.,* and *Victory Markets,* which were decided on the capitalization theory, the shareholder benefit was clearly present in this case.

The dissenters have uncritically accepted petitioner's argument that the corporate propriety of engaging the investment bankers and attorneys to defend against a takeover bid requires that all their fees and disbursements be deductible as ordinary and necessary business expenses. This argument equates the propriety of incurring the costs with their deductibility as ordinary and necessary expenses. Apparently, this is on the theory that the costs are an integral part of SCI's appropriate initial response to the hostile offer, which includes the defense of the target's current business and business plan. In my view, the bulk of the fees incurred by the target is nondeductible because their unavoidable effect is to benefit the shareholders. This is so even though they were initially incurred as part of an appropriate corporate response to a hostile offer, and without regard to the cor-

---

[5] See *supra* note 3.

porate propriety of the purpose that actuated the directors in incurring them.

This case can be analyzed in terms of the traditional distinctions about primary versus incidental purposes and effects of the expenditures in dispute. A subordinate or incidental corporate business purpose will not control where the primary purpose of the expenditure is to benefit the shareholders, resulting in a dividend taxable to them. *Jack's Maintenance Contractors, Inc. v. Commissioner,* 703 F.2d 154, 156 (5th Cir. 1983), revg. T.C. Memo. 1981–349; *Sammons v. Commissioner,* 472 F.2d 449, 452 (5th Cir. 1972), affg. on this issue and revg. and remanding on another issue T.C. Memo 1971–145; *Cummins Diesel Sales of Oregon, Inc. v. United States,* 207 F. Supp. 746, 748–749 (D. Or. 1962), affd. 321 F.2d 503 (9th Cir. 1963). Conversely, where corporate expenditures are primarily associated with the profit-motivated purposes of the corporation, and shareholder use and benefit are distinctly secondary, the corporate deduction will be allowed. See *International Artists, Ltd. v. Commissioner,* 55 T.C. 94, 104–105 (1970). However, where there are both substantial business purposes and substantial shareholder benefits, allocation becomes appropriate. *Hal E. Roach Studios v. Commissioner,* 20 B.T.A. 917 (1930), cited with approval and applied in *International Artists, Ltd. v. Commissioner, supra* at 105, is instructive on this point.

The taxpayer in *Hal E. Roach Studios v. Commissioner, supra,* was a corporate movie studio that had built a yacht for use in making a marine movie series. The Commissioner did not question the taxpayer's corporate business judgment in so doing. However, after the demand for such movies drastically diminished, members of the family of the corporation's sole shareholder used the yacht for personal pleasure trips. The Commissioner disallowed the deductions claimed by the corporation for maintenance expenses and depreciation during this period, although the yacht was used a dozen times during the year for movie production, was at all times kept available for business, and would have deteriorated unless maintained. In these circumstances the Board applied the equivalent of the *Cohan* [6] rule, and concluded:

---

[6] *Cohan v. Commissioner,* 39 F.2d 540 (2d Cir. 1930), affg. in part and revg. in part 11 B.T.A. 743 (1928).

Though the evidence was not precise on the relative costs incurred for business and pleasure use, we are satisfied that at least one-half of the expense was an ordinary and necessary expense of petitioner's business, and accordingly we allow the sum of $8,776.67 as a deduction [$17,543.35 having been disallowed by the Commissioner]. [*Id.* at 919.]

The case stands for the proposition that, even though corporate business judgment is properly exercised in incurring the expense, there is still a basis for making an allocation between deductible business purpose and nondeductible shareholder personal purpose on the basis of the actual benefits given and received.[7]

Under this approach, we would have no occasion, much less any need, to decide whether the nondeductible fees of SCI would have properly been includable in the income of the SCI shareholders as a dividend. Putting aside the administrative and other difficulties of pursuing the income inclusion of any such fees against the shareholders of a public company, the questions of corporate disallowance/shareholder inclusion can properly be decoupled where the corporate expenditures had substantial corporate business purposes as well as directly benefited the shareholders in their capacities as potential and actual sellers of their stock.[8] In any event, the former SCI shareholders are not before us, and in all likelihood respondent did not determine any dividend tax deficiencies against them.[9]

---

[7] Compare *Sibley, Lindsay & Curr Co. v. Commissioner,* 15 T.C. 106 (1951) and *Mills Estate Inc. v. Commissioner,* 17 T.C. 910 (1952), revd. and remanded 206 F.2d 244 (2d Cir. 1953) with *Galt v. Commissioner,* 19 T.C. 892 (1953), affd. in part and revd. in part 216 F.2d 41 (7th Cir. 1954).

[8] The approach suggested here would be consistent with the observation in Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 7.05, at 7–33 (4th ed. 1979), that the Service was often content to disallow deduction of constructive dividends at the corporate level without coupling the disallowance with a deficiency determination based upon a dividend income inclusion to the shareholders. But see Rev. Rul. 75–421, 1975–2 C.B. 108.

[9] *Martin v. Machiz,* 251 F. Supp. 381 (D. Md. 1966), is arguably in point on this issue. The District Court's introductory remarks indicated that the nondeductibility of the payments in issue to the corporate payor did not require that they must have been taxable or should have been taxed to its shareholders as dividends:

The fact that an expense was not an ordinary and necessary business expense of a corporation does not unerringly point to the conclusion that the expense was a personal expense of the corporation's stockholders. An expense might be a capital expense to a corporation, or a non-allowable expense of a corporation, and still not be a personal expense of the corporation's stockholders. [*Id.,* at 384.]

The taxpayer before the District Court in *Martin v. Machiz, supra,* was not the corporation, but its dominant shareholder. One question before the court was whether a proportionate part of the fee paid by the corporation in 1959 for the preparation of a valuation of the corporation "as a basis for merger or valuation for other purposes * * * [and to] locate merger and/or sale

Finally, *United States v. Federated Dept. Stores, Inc.,* 171 Bankr. 603 (S.D. Ohio 1994),[10] is the first post-*INDOPCO, Inc.* case holding that expenses attributable to unsuccessful defenses against hostile takeovers are deductible, on the alternative grounds of section 162 and section 165. Although we are not bound to follow a District Court opinion, its reasoning and approach merit some further discussion.

At issue were the contractually committed break-up fees paid in two separate transactions by Allied Stores and Federated Department Stores, respectively, to "white knights" in the aftermath of their highly leveraged acquisitions by Robert Campeau. Soon after Allied and Federated were acquired, they went into bankruptcy because they could not sustain the debt burdens imposed on them to finance the acquisitions. The evident sympathies of the bankruptcy judge and the District Court judge for these hapless debtors, and the obvious lack of "synergy" between the acquiror and his targets, are clear.

In the Allied/Federated situations, the expenses were held deductible under section 162 on essentially the same grounds used by the dissenters in the case at hand, that the break-up fees provided no benefit to the corporate debtors lasting beyond the years in which they were paid.[11] However, not present in the case at hand are explicit findings in the Allied/Federated cases that the provisions for the payment of the break-up fees did not enhance the amounts that the debtors' shareholders actually received in the acquisition transactions. The final and most important basis for distinguish-

---

and/or refinancing to market personal ownership of Mr. Martin [the individual shareholder/taxpayer]" should be includable in the shareholder's income. *Id.* at 383. The court concluded that the fee served a valid business purpose and was not taxable as a dividend to the shareholder. Consistent with its introductory remarks, however, the District Court indicated that the payment might not have been deductible by the corporation, not a question before the court:

Thus, the Court concludes that the payment was not payment of a personal expense of taxpayers or taxpayer-husband, but was a payment for the benefit of Cloverdale and serving its legitimate corporate business purpose, *whether or not it was an item chargeable against the corporation's ordinary income as an ordinary and necessary business expense.* * * * [*Id.* at 385; emphasis supplied.]

[10] For an accurate and useful summary of the facts of these cases and of the opinions of the bankruptcy judge and the District Court, see Lipton & Brenneman, "Expenses Related to Failed Merger Defense Held to Be Deductible Despite *INDOPCO*", 82 J. Taxn. 26 (1995).

[11] The alternative holding in *United States v. Federated Dept. Stores, Inc.,* 171 Bankr. 603 (S.D. Ohio 1994), is that the break-up fees should be treated as losses under section 165 on the ground that the acquisitions by the white knights, which never occurred, made it appropriate to treat the fees as abandonment losses with respect to transactions that had been initiated but never consummated.

ing the Allied/Federated cases from the case at hand is that the break-up fees in Allied/Federated were more directly related to the "white knight" transactions that were never consummated than to the acquisitions that actually did occur.

SWIFT, WELLS, and VASQUEZ, *JJ.,* agree with this concurring opinion.

---

## APPENDIX

The following chart shows the closing price of Staley Continental, Inc. common stock on the New York Stock Exchange between March 1, 1988, and June 7, 1988:

| Date | Closing price | Date | Closing price |
|---|---|---|---|
| Mar. 1 | 23.875 | Apr. 20 | 36.375 |
| Mar. 2 | 23.750 | Apr. 21 | 37.250 |
| Mar. 3 | 24.125 | Apr. 22 | 37.000 |
| Mar. 4 | 24.250 | Apr. 25 | 36.500 |
| Mar. 7 | 23.750 | Apr. 26 | 36.500 |
| Mar. 8 | 24.125 | Apr. 27 | 37.000 |
| Mar. 9 | 25.000 | Apr. 28 | 37.875 |
| Mar. 10 | 24.875 | Apr. 29 | 38.375 |
| Mar. 11 | 25.125 | May 2 | 37.875 |
| Mar. 14 | 24.875 | May 3 | 38.375 |
| Mar. 15 | 24.625 | May 4 | 38.375 |
| Mar. 16 | 24.750 | May 5 | 38.000 |
| Mar. 17 | 25.375 | May 6 | 38.250 |
| Mar. 18 | 25.750 | May 9 | 38.750 |
| Mar. 21 | 25.675 | May 10 | 38.125 |
| Mar. 22 | 25.375 | May 11 | 37.125 |
| Mar. 23 | 25.500 | May 12 | 37.000 |
| Mar. 24 | 28.000 | May 13 | 36.875 |
| Mar. 25 | 29.500 | May 16 | 36.500 |
| Mar. 28 | 29.750 | May 17 | 36.250 |
| Mar. 29 | 30.375 | May 18 | 36.250 |
| Mar. 30 | 28.500 | May 19 | 36.250 |
| Mar. 31 | 28.500 | May 20 | 36.250 |
| Apr. 1 | 28.500 | May 23 | 36.250 |
| Apr. 4 | 28.125 | May 24 | 36.250 |
| Apr. 5 | 29.375 | May 25 | 36.250 |
| Apr. 6 | 30.125 | May 26 | 36.250 |
| Apr. 7 | 31.500 | May 27 | 36.375 |
| Apr. 8 | 37.375 | May 30 | Holiday |
| Apr. 11 | 36.750 | May 31 | 36.375 |
| Apr. 12 | 36.750 | June 1 | 36.250 |
| Apr. 13 | 36.500 | June 2 | 36.250 |

| Date | Closing price | Date | Closing price |
|------|---------------|------|---------------|
| Apr. 14 | 35.750 | June 3 | 36.250 |
| Apr. 15 | 34.875 | June 6 | 36.500 |
| Apr. 18 | 36.125 | June 7 | 36.500 |
| Apr. 19 | 35.750 | - - - | - - - |

COHEN, *J.,* dissenting: As indicated in the majority opinion note 1, the facts stated in that opinion are those found by me as the trial judge. I respectfully dissent from the legal analysis and the result reached by the majority. I believe that the facts distinguish this case from *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79 (1992), and *Victory Mkts., Inc. & Subs. v. Commissioner,* 99 T.C. 648 (1992). The majority attempts to mask the factual distinctions between this case and *INDOPCO, Inc.* and *Victory Mkts., Inc.* by substituting its judgment as to long-term benefits for that of petitioner's board of directors and by placing unwarranted reliance on the benefits sought by Tate & Lyle in its takeover efforts. In addition, the majority adopts, and the concurring opinion of Judge Beghe highlights, a rule that any expenses relating to a change in corporate ownership are not deductible. That is not the rule applied in *INDOPCO, Inc.* or *Victory Mkts., Inc.;* it is a more stringent rule not supported by those cases, the authorities on which they rely, or any other decision.

The distinguishing factual circumstances herein are shown by a brief recapitulation of *INDOPCO, Inc., Victory Mkts., Inc.,* and this case. In *INDOPCO, Inc.,* representatives of the Unilever Group indicated an interest in making a tender offer for all of the stock of the taxpayer, then known as National Starch & Chemical Corp. (National Starch), at a meeting with two of the taxpayer's largest shareholders and the chairman of the taxpayer's board of directors. In subsequent discussions, the Unilever Group indicated that it would proceed with the tender offer only if the taxpayer favored the acquisition of its stock. The National Starch directors retained an investment banking firm to value the stock, to render a fairness opinion, and to stand ready to assist if there were a hostile tender offer. The investment bankers concluded that the terms of the proposed transaction

were fair and equitable to the taxpayer's shareholders from a financial point of view.

In *National Starch & Chem. Corp. v. Commissioner,* 93 T.C. 67 (1989), we held that the investment banking fees were not deductible under section 162(a). We set forth the following basis for that holding:

We base our holding upon our judgment that petitioner's directors determined that it would be in petitioner's long-term interest to shift ownership of the corporate stock to Unilever. The expenditures in issue were incurred incident to that shift in ownership and, accordingly, lead [sic] to a benefit "which could be expected to produce returns for many years in the future." * * * The reason for the capitalization of such expenditures is "that *the purpose for which the expenditure is made* has to do with the corporation's operations and betterment, sometimes with a continuing capital asset, for the duration of its existence or for the indefinite future or for a time somewhat longer than the current taxable year, in contrast to being devoted to the income production or other needs of the more immediate present." *General Bancshares Corp. v. Commissioner, supra* [326 F.2d 712] at 715 [(8th Cir. 1964)] * * * [*Id.* at 75–76; emphasis added.]

Our holding in *National Starch* that the expenditures at issue had to be capitalized and our findings that, in fulfilling its fiduciary obligation to the corporation and its shareholders, the board of directors must have determined that it was in the National Starch long-term interest to shift ownership of the stock to Unilever; that the taxpayer's 1978 annual report stated that the taxpayer would benefit from the availability of the enormous resources of the Unilever Group; that the investment bankers stated that the taxpayer's affiliation with Unilever would create the opportunity for "synergy"; and that the taxpayer's opportunities were broadened because of Unilever's resources properly focused on the purposes for which the expenditures were made. The Court of Appeals for the Third Circuit affirmed our decision. *National Starch & Chem. Corp. v. Commissioner,* 918 F.2d 426 (3d Cir. 1990).

The Supreme Court granted certiorari, and, in *INDOPCO, Inc. v. Commissioner, supra,* the Supreme Court focused its opinion primarily on rejecting the taxpayer's argument that separate and distinct assets must be created or enhanced by the expenditures in order to be capitalized under section 263. However, the Supreme Court also applied the rule we applied in *National Starch* and cited with approval one of the

decisions from which that rule is derived and on which we relied in *National Starch.* The Supreme Court stated:

courts more frequently have characterized an expenditure as capital in nature because *"the purpose for which the expenditure is made* has to do with the corporation's operations and betterment, sometimes with a continuing capital asset, for the duration of its existence or for the indefinite future or for a time somewhat longer than the current taxable year." *General Bancshares Corp. v. Commissioner,* 326 F.2d at 715. * * * [*INDOPCO, Inc. v. Commissioner,* 503 U.S. at 90; emphasis added.]

With the foregoing rule in mind, the Supreme Court emphasized that the fees were capital expenditures because they were incurred for the purpose of facilitating a merger that created significant long-term benefits to National Starch. Citing statements in reports made by National Starch and its investment bankers, the Supreme Court held that the record supported our finding that the fees were incurred for the purpose of producing significant long-term benefits for National Starch as a result of the merger. The Supreme Court did not indicate in *INDOPCO, Inc.* that its decision was dependent on whether the transaction was a friendly merger or a hostile takeover.

In *Victory Mkts., Inc. v. Commissioner, supra,* the taxpayer incurred professional service fees in connection with the acquisition of its stock and claimed that it was entitled to deduct such expenses because, unlike the taxpayer in *INDOPCO, Inc.,* it was acquired in a hostile takeover. We expressly declined to decide whether *INDOPCO, Inc.* required capitalization of expenses incurred in hostile takeovers, however, because we concluded that the nature of the takeover there was not hostile and that the facts were generally indistinguishable from those in *INDOPCO, Inc.* Before discussing those facts and reaching our conclusion in *Victory Mkts., Inc.,* we made the following observations about the Supreme Court's decision in *INDOPCO, Inc.:*

The Court, quoting *General Bancshares Corp. v. Commissioner,* 326 F.2d 712, 715 (8th Cir. 1964), concluded that the rationale behind the "well-established rule" that expenses incurred in reorganizing or restructuring a corporate entity are not deductible under section 162(a) *because the purpose for which they are made "'has to do with the corporation's operations and betterment* * * * for the duration of its existence or for the indefinite future or for a time somewhat longer than the current taxable year'"* applies equally in the context of a friendly takeover to the expenditures

for professional services at issue [there]. * * * [99 T.C. at 661; emphasis added.]

Applying the foregoing rule, we concluded in *Victory Mkts., Inc.* that the expenses at issue were not incurred for the purpose of defending against a hostile takeover because: (1) The initial contact letter from the acquiring corporation expressed a hope that the transaction could be completed on a mutually acceptable and friendly basis and indicated that the acquiring corporation intended to preserve the continuity of the taxpayer's management without closing or consolidating the taxpayer's facilities or operations; (2) the written offer was subject to the approval of the taxpayer's board of directors and reiterated the desire of the acquiring corporation to proceed in a friendly and mutually acceptable manner; (3) at no time did the acquiring corporation attempt to circumvent the taxpayer's board of directors by making a tender offer directly to the taxpayer's shareholders; (4) the actions of the acquiring corporation were not perceived by the taxpayer's board of directors as hostile; and (5) the board of directors did not activate the dividends rights plan that it had adopted. *Id.* at 662.

Following the analysis in *INDOPCO, Inc.*, we held in *Victory Mkts., Inc.* that the taxpayer made the expenditures at issue for the purpose of deriving long-term benefits that it expected to result from its acquisition and that, therefore, those expenditures were capital in nature and not deductible under section 162. *Id.* at 662–665. We found that the directors of the taxpayer determined that it would be in the long-term interest of Victory Markets to accept the takeover offer because the taxpayer's press release announcing the merger touted the benefits of the acquisition; because the announcement to the taxpayer's shareholders stated that, in approving the merger, the board of directors concluded that a merger would strengthen the taxpayer and put it in an excellent position for further expansion; and because, in approving the takeover, the taxpayer's directors, exercising their duty of care, must have determined that the takeover was in the best interests of the taxpayer and its shareholders. *Id.* at 664–665. We also noted that the taxpayer received long-term benefits from the availability of the acquiring corporation's

resources and as a result of its conversion from a publicly held corporation to a wholly owned subsidiary.

In contrast to the circumstances in *Victory Mkts., Inc.,* in this case Tate & Lyle bypassed the management and board of directors of SCI and made its offer directly to the SCI shareholders. Tate & Lyle was publicly critical of SCI management and its diversification strategy and commenced litigation against SCI. Tate & Lyle did not seek to proceed primarily in a friendly and mutually acceptable manner. Tate & Lyle retained the right to waive any of the conditions of the tender offer. Thus, the Tate & Lyle "threat" was not eliminated by the court rulings upholding the shareholder rights plan adopted by SCI and the Delaware antitakeover statute. The ultimate decision of the SCI board to negotiate with Tate & Lyle was made only after an attempt to find an alternative failed and the board members had no choice. The uncontradicted testimony of board members was that the board "reluctantly" chose to merge with Tate & Lyle without activating the shareholder rights plan because such an action would have resulted in "endless litigation" that "wouldn't have served really a useful purpose at that point because the shares in all probability would have been tendered."

The parties disagree as to when the SCI board became subject to the duties discussed in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del. 1986), and in the majority and concurring opinions. The parties agree, however, that, as of May 10, 1988, when the investment bankers informed SCI that they could not find a viable alternative to the Tate & Lyle offer, the sale of SCI was inevitable and the SCI board of directors was obligated to obtain the maximum value for the shareholders. When the board of directors became subject to the duties discussed in *Revlon,* the board changed "from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Id.* at 182. The record indicates that the directors ultimately recommended the Tate & Lyle offer because it provided a greater value for the SCI shareholders than any of the alternatives that were considered. As a result, in contrast to *National Starch* and *Victory Mkts., Inc.,* we have no reason to conclude that, acting in furtherance of their fiduciary duties, the SCI directors approved the

revised Tate & Lyle offer because of long-term benefits *for SCI.*

The only benefits to the future operations of petitioner discussed in the majority opinion are those perceived by the offeror, Tate & Lyle, and not by the management that incurred the expenses. The majority also states: "Positive consequences of a nonoperational nature resulting to SCI from the acquisition include a consolidation of stock ownership and relief from shareholder-related expenses and duties." Majority op. p. 183. The majority seems to believe that it is always better for a corporation to be privately held rather than publicly held—a questionable assumption considering this nation's economy.

In any event, the transformation from a publicly held corporation to a wholly owned subsidiary was one of the results considered to be a significant benefit to the taxpayers in *INDOPCO, Inc.* and *Victory Mkts., Inc.* because the acquired corporations there indicated that such results were benefits of the takeovers that they expected and sought. For example, in *INDOPCO, Inc.,* the Supreme Court noted that a National Starch progress report stated that the company would benefit from the availability of Unilever's "enormous resources"; that a Morgan Stanley report indicated that National Starch management believed that "some synergy may exist with the Unilever organization"; and that National Starch management "viewed the transaction as 'swapping approximately 3500 shareholders for one'" as a benefit. *INDOPCO, Inc. v. Commissioner,* 503 U.S. at 88–89 (quoting 918 F.2d at 427). Similarly, in *Victory Mkts., Inc.,* the Victory Markets press release that announced the merger recounted the vast holdings of the acquiring corporation, its skill and expertise, and its familiarity with the line of business of Victory Markets. Also, Victory Markets represented to its shareholders that, in approving the merger, the board of directors "concluded that a merger with LNC [Industries Pty. Ltd.] would strengthen Victory [Markets] and put the company in an excellent position for further expansion." *Victory Mkts., Inc. v. Commissioner,* 99 T.C. at 664.

Here, the record contains no evidence that the SCI management or board of directors thought or indicated that a combination with Tate & Lyle would produce any benefits for SCI. Instead, the record indicates that SCI management

believed that a Tate & Lyle takeover would not be in the best interests of SCI because Tate & Lyle had nothing to offer in terms of capital, marketing, or research and development and also because Tate & Lyle sought to abandon the SCI long-term strategic plan of diversifying into the food service business.

While petitioner has the burden of proving its right to the deduction in issue, Rule 142(a); *INDOPCO, Inc. v. Commissioner, supra* at 84, here the contemporaneous documentation supports the testimony presented by petitioner concerning the viewpoint of its board. The majority assertion that the viewpoint reflected only the "directors' subjective reasons for making the expenditure" that "are not significant to the analysis", majority op. p. 194, is unwarranted. In a letter to the SCI shareholders, Nordlund stated that the SCI board recommended the Tate & Lyle offer because it was "fair to and in the best interests of shareholders" of SCI but made no mention of any benefits for SCI that might occur as a result of the merger. The May 5, 1988, Merrill Lynch memorandum stated that Merrill Lynch and First Boston were retained by the SCI board of directors "in its defense against a proposed hostile acquisition of Staley by Tate & Lyle", and the record as a whole indicates that the primary focus of the investment bankers' work was the pursuit of alternatives in an effort to prevent the Tate & Lyle tender offer from succeeding.

The majority disallows the deductions claimed under section 162 because "the investment bankers' fees and the disallowed portion of the printing costs were incurred in connection with a change in the ownership of SCI." Majority op. p. 200. The holding of *INDOPCO, Inc.* is that "expenses * * * incurred *for the purpose* of changing the corporate structure for the benefit of future operations" are not deductible. *INDOPCO, Inc. v. Commissioner*, 503 U.S. at 89 (quoting *General Bancshares Corp. v. Commissioner*, 326 F.2d 712, 715 (8th Cir. 1964), affg. 39 T.C. 423 (1962)) (emphasis added). I am persuaded by petitioner that the expenses in dispute were incurred by Staley for the purpose of preventing a change that the duly existing management believed would not benefit future operations and satisfying the fiduciary obligations of the corporation's directors. I do not agree that such expenditures are inherently capital and not deductible.

I have other disagreements with assumptions made in the majority opinion and in Judge Beghe's concurring opinion. For example, there is the assertion that the fees paid to SCI's investment bankers necessarily increased the price of the stock. Majority op. p. 183. This analysis confuses the simple sequence of events with the purpose for which the expenditure was incurred, or the cause and effect relationship between an expenditure and a change in the price of the stock. The initial Tate & Lyle offer was $32 per share, about 15 percent or $5 less than the closing price of the stock on the day bidding commenced. Tate & Lyle certainly had its own reasons for desiring the purchase and was independently evaluating the acquisition in relying on its own advisers. The Tate & Lyle decision to increase the price caused the expense of subsequent analysis on behalf of Staley and was not necessarily or even probably induced by the initial analysis provided to Staley's board. In any event, benefits to the *shareholders* were not a factor addressed in *INDOPCO, Inc.*

When it tried this case, petitioner had the benefit of the opinions of the Supreme Court in *INDOPCO, Inc.* and of this Court in *Victory Mkts., Inc.* It undoubtedly tailored its evidence and arguments to distinguish those cases. The evidence was credible because of the contemporaneous documentation that preceded the opinions in *INDOPCO, Inc.* and *Victory Mkts., Inc.* The majority and the concurring judges have now applied a more stringent rule. That rule may create more certainty by requiring capitalization of all expenses relating to restructuring of stock ownership. However, Congress did not provide such a rule, although it could have. The Supreme Court did not state such a rule in *INDOPCO, Inc.,* although it could have. Notwithstanding the extensive and scholarly citation of authority by the majority and concurring opinions, the rule they adopt has not previously been adopted by Congress or by any court. I would not do so here. I would hold that the investment bankers' fees in dispute were deductible under section 162(a) as ordinary and necessary business expenses.

CHABOT, JACOBS, CHIECHI, and LARO, *JJ.,* agree with this dissent.

LARO, *J.,* dissenting: The majority opinion seems to establish a rule of law that expenses incurred in connection with a successful takeover of a corporation are not deductible. In arriving at this conclusion, the majority opinion presumes, but does not find as a fact, that long-term benefits were achieved as a result of this transaction. I respectfully dissent from the legal analysis and the result reached by the majority.

The Supreme Court in *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79 (1992), affg. *National Starch & Chem. Corp. v. Commissioner,* 918 F.2d 426 (3d Cir. 1990), affg. 93 T.C. 67 (1989), held that a target corporation must capitalize professional fee expenses that it incurs in furtherance of a friendly acquisition involving significant long-term benefits to itself. In *Victory Mkts., Inc. & Subs. v. Commissioner,* 99 T.C. 648 (1992), we applied the Supreme Court's long-term benefits analysis to similar facts and denied a current deduction for professional fees. In both cases we found that the target company's board anticipated benefits to the target company from the proposed takeover and worked toward conclusion of a deal on mutually agreeable terms. This case, however, involves a hostile takeover. Tate & Lyle made a public tender offer directly to the SCI shareholders, seeking to gain control of SCI, fire its senior management, sell off certain of its assets, and change its business policies. With the help of its investment bankers, SCI resorted to various maneuvers to thwart Tate & Lyle's tender offer, including stockholder rights plans ("poison pills") and an exhaustive search for other candidates for a merger that would leave SCI's business structure intact. Despite the contextual differences between the professional fee expenditures in this case and in the *INDOPCO, Inc.* and *Victory Mkts., Inc.* cases, the majority concludes that the tax treatment of the expenditures should be the same. It reaches this result by denying that the purpose of the expenditures is relevant to the analysis and by inferring the existence of benefits to SCI with little, if any, factual foundation in the record for this inference. The majority opinion's attempt to apply the holding of *INDOPCO, Inc.* to the facts of a hostile takeover is unconvincing, and the broad and novel proposition that emerges represents an unwarranted extension of *INDOPCO, Inc.* and a departure from other settled principles of law in this area.

In *INDOPCO, Inc.* the Supreme Court used as a test for capitalization whether the change in corporate structure "produced significant [long-term benefits] to * * * [the target company] that extended beyond the tax year in question". *INDOPCO, Inc. v. Commissioner,* 503 U.S. at 88. The Supreme Court also inquired as to whether "changing the corporate structure for the benefit of future operations" was the "purpose for which the expenditure is made". *Id.* at 89–90.

The majority opinion identifies no specific long-term benefits to SCI from the takeover that could account for the SCI board's decision to abandon its resistance.

The majority suggests that since the "'directors approved the takeover, they must have determined that it was in the best interest of [the company] and its shareholders'". Majority op. p. 198 (quoting *National Starch & Chem. Corp. v. Commissioner,* 93 T.C. at 76). However, the majority does not identify any significant benefit to SCI to conclude that indeed it was in the best interest of SCI for the takeover to occur. It would be erroneous to conclude that a benefit is achieved merely by taking a public company private. In some instances, such a transaction is beneficial, but in other instances it is not. A private company does not have access to the public markets for new capital and does not have the same liquidity for its shareholders. One cannot accurately conclude, therefore, that a hostile takeover resulting in a public company's going private produces in and of itself a long-term benefit.

It would be wrong to suggest that merely because a takeover is hostile, rather than friendly, the expenses incurred in connection therewith should be deductible. However, a complete legal analysis would address the issue as to whether or not the takeover was hostile or friendly for the purpose of seeing whether there were any long-term benefits in connection with the transaction. Having found facts to conclude that the takeover is hostile, one should strongly suspect that there are no long-term benefits anticipated by the target in connection with the transaction.[1] Yet the majority opinion

---

[1] "Some circumstantial evidence is very strong, as when you find a trout in the milk." Bartlett, Familiar Quotations 557 (15th ed. 1980).

seems to dismiss the fact that the takeover involved in this case was hostile as a relevant factor.

Under *INDOPCO, Inc.* the long-term benefits inquiry addresses whether the expenses were incurred for the *purpose* of changing the corporate structure for the benefit of future operations. *INDOPCO, Inc. v. Commissioner, supra* at 89. In hostile takeovers this element will not be present. Defensive measures are not intended to produce any lasting improvements; their goal is merely to preserve the status quo, to enable the target to continue its business operations in the same manner as before the threat emerged. They are designed to prevent, not facilitate, a change in corporate structure. The majority opinion disregards the references to the purpose of the expenditures in the *INDOPCO, Inc.* opinion and dismisses purpose as irrelevant. To the contrary, however, *INDOPCO, Inc.* seems to place emphasis on "purpose".

The majority opinion also does not distinguish successfully the recent District Court case of *United States v. Federated Dept. Stores, Inc.,* 171 Bankr. 603 (S.D. Ohio 1994), which allowed a deduction for certain expenses (break-up fees) paid to a "white knight" by the target in an unsuccessful defense to a hostile takeover. The court relied on a long line of cases that allow deduction for expenses incurred in the defense of an existing business against attack as well as other well-settled principles of law concerning the deductibility of expenses incurred for abandoned transactions. Although the majority cites the *Federated Dept. Stores* case, I believe that it does not satisfactorily distinguish that case from the case at hand. Moreover, the majority fails to address the central proposition of that decision: *INDOPCO, Inc.* did not purport to override the body of law relied on by the court in *United States v. Federated Dept. Stores, Inc., supra.*

CHABOT and JACOBS, *JJ.,* agree with this dissent.